STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

JOANNE HENRY, ET UX.

VERSUS

ZURICH AMERICAN INSURANCE COMPANY, ET AL.


**********

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 09-C-1740-A
HONORABLE JAMES P. DOHERTY, JR., DISTRICT JUDGE

**********

JIMMIE C. PETERS
JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Jimmie C. Peters, and Marc T. Amy, Judges.

**AFFIRMED.**

**Russell O. Brabham**
**2924 Knight Street, Suite 365**
**Shreveport, LA 71105**
**(318) 524-8024**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
     **Ricky Henry**


**Stephen H. Vogt**
**Thibaut, Thibaut & Vogt LLC**
**P. O. Box 36**
**Baton Rouge, LA 70821-0036**
**(225) 923-3200**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
     **Zurich American Insurance Company**
     **Baronne Veterinary Clinic, Inc.**
     **Joshua T. Hill, DVM**

**Iain L. Kennedy**
**Shook, Hardy & Bacon, L.L.P.**
**Miami Center, Suite 3200**
**201 South Biscayne Boulevard,**
**Miami, FL 33131**
**(305) 358-5171**
**COUNSEL FOR OTHER:**
> **American Kennel Club**
> **Cat Fanciers' Association**
> **Animal Health Insitute**
> **American Veterinary Medical Association**
> **American Animal Hospital Association**
> **National Animal Interest Alliance**
> **American Pet Products Association**
> **Pet Industry Joint Advisory Council**
> **Louisiana Veterinary Medical Association**

**PETERS, J.**

The plaintiff in this matter, Rick Henry, appears individually and as executor of the estate of his wife, Joanne Henry,[1] and appeals the trial court judgment dismissing the claims for damages asserted against the defendants, Zurich American Insurance Company, Baronne Veterinary Clinic, Inc., and Joshua T. Hill, D.V.M. For the following reasons, we affirm the trial court judgment in all respects.

## DISCUSSION OF THE RECORD

The Henrys acquired ownership of a thoroughbred filly named Toolights Ruckus in a November 17, 2006 claiming race at Delta Downs Race Track in Vinton, Louisiana.[2] The Henrys paid $7,500.00 for the horse, and the claim ticket lists Mrs. Henry as the owner and Sam B. David, Jr. as the trainer of record. At some point after the Henrys acquired ownership of the filly, they entered into a training agreement with Sam David and his son, Shawn.[3] The training agreement, which was not reduced to writing, provided that the Davids would pay the cost of training, feeding, and boarding the horse, and the Henrys would be responsible for the cost of any required veterinarian treatment. The parties further agreed that the money produced by the horse's racing endeavors would be divided equally between them.

---

[1] Mrs. Henry died sometime between the initial filing in this matter and the final judgment rendered by the trial court, and the final judgment marks the only time the trial court refers to Mrs. Henry's death. Nothing in the record suggests that Mr. Henry filed pleadings to be recognized as the representative of the estate of his wife, but the procedural capacity issue has not been raised by the defendants and we do not need to reach that issue in order to dispose of the appeal.

[2] In a "claiming race," a recognized racing interest or a party, licensed as an owner by the Louisiana Racing Commission, or his authorized agent, can claim any of the horses racing in that particular race by depositing a claim ticket with the race steward prior to the start of the race and then by paying the claiming price after the race. Ownership of the claimed horse vests in the new owner as soon as the horse leaves the starting gate in that race and is irrevocable. Louisiana Racing Commission Rules of Racing, 35 La.Admin. Code pt. XI, § 9901, § 9913, § 9919

[3] Shawn worked for his father as an assistant trainer.

Between the time the Henrys acquired Toolights Ruckus and the April 7, 2008 incident giving rise to this litigation, the filly was boarded primarily in South Louisiana, raced fifteen times, and generated approximately $101,000.00 in winnings for the owners and training team. Sam David, who has been a licensed trainer since 1972, and trained horses primarily in the Shreveport, Louisiana area, delegated the training responsibilities to his son.[4] Shawn David fulfilled these obligations except for a nine-month period beginning in late 2007, when he accepted a training position in California. During that period, Sam David bore the responsibility under the agreement.

Toolights Ruckus suffered from a breathing condition which manifested itself during the stresses of racing. This condition was known to the owners and trainers soon after the Henrys purchased her. The filly had a tendency to displace her soft palate, which obstructed her air flow and affected her racing performance. The evidence at trial established that this condition is not uncommon and is easily addressed by the performance of a minor surgical procedure called a strap muscle myectomy.

When Shawn David returned from California to resume his working relationship with his father, he was informed by his father that Toolights Ruckus had also developed a hoof condition called white line disease. Because the horse could not be raced until this condition resolved itself, Shawn David decided this would be the right time to have the surgery performed to correct the breathing condition. When he contacted the Henrys concerning the surgery,[5] he did not

---

[4] Shawn David ultimately became a licensed trainer, but that occurred after the events giving rise to this litigation.

[5] Mr. Henry testified that this conversation occurred on Sunday, April 6, 2008, or two days before the surgery was performed.

receive an immediate approval for the surgery, and Mr. Henry suggested that he and his wife would consider their options and get back with him.

Shawn David did not wait for Mr. Henry to get back with him on the surgery issue. Instead, on April 7, 2008, he took the filly to Dr. Joshua T. Hill at the Baronne Veterinary Clinic (Clinic), in Opelousas, Louisiana, for surgical correction of the breathing problem. Dr. Hill is a veterinarian specializing in equine medicine and the Clinic was routinely utilized by the Davids. The Clinic initially began providing Toolights Ruckus with veterinarian care in November of 2006, and a majority of the treatment required of the filly since that date, was performed there. When he presented the horse to the Clinic on April 7, 2008, Shawn David signed the consent form authorizing the clinic to perform the surgery, and he informed the staff that he, not the Henrys, would be paying for that surgical procedure. The next day, on April 8, 2008, Dr. Hill placed the filly under a general anesthesia and performed the strap muscle myectomy. Toolights Ruckus died from a reaction to the anesthesia that had been administered during the surgical procedure.

On March 30, 2009, the Henrys filed suit naming as defendants, the Clinic, Dr. Hill, and their insurer, Zurich American Insurance Company; and Shawn David and his unknown insurer, XYZ Insurance Company.[6] In seeking damages for the death of Toolights Ruckus, the Henrys asserted that neither Shawn David, Dr. Hill, nor anyone in the Clinic had authority to perform surgery on the filly. They further asserted that Dr. Hill and the Clinic were negligent in (1) failing to determine the correct ownership of the filly and in (2) failing to obtain their permission for the surgery.

_____

[6] In filing the suit, the Henrys requested that the clerk of court hold service of process on Shawn David and his liability insurer.

Issue was never joined with Shawn David and his insurer, and the matter went to trial on the merits against the remaining defendants on February 27, 2012. After completion of the evidentiary phase of the trial, the trial court took the matter under advisement. On March 19, 2012, the trial court rendered written reasons for judgment wherein it found no liability on the part of the defendants. The trial court executed a written judgment to this effect on April 23, 2012, and, thereafter Mr. Henry perfected this appeal.[7] In his appeal, he raises four assignments of error:

1.    The trial court erroneously found that defendants Baronne Veterinary Clinic, ("BVC") and Joshua T. Hill, D.V.M., ("Dr. Hill"), reasonably relied on casual verbal statements made by Shawn David, an assistant trainer, that he was the owner of the horse, Toolights Ruckus, which he presented for and upon which BVC and Dr. Hill performed non-emergent, elective surgery under general anesthesia and from which surgery the horse did not recover and died.

2.    The trial court failed to consider the undisputed evidence at trial that established that defendants' own medical records required to be maintained and in fact maintained by BVC and Dr. Hill reflected that Joanne Henry was the owner of Toolights Ruckus and that Sam David was the registered trainer of Toolights Ruckus.

3.    The trial court failed to consider properly the professional rules and regulations that defendants admitted bound their conduct as Doctors of Veterinary medicine, and, particularly, as physicians for registered thoroughbred racehorses, in analyzing the duties owned by defendants to plaintiffs.

4.    The trial court failed to recognize the continued existence of the veterinarian-client-patient relationship between defendants and plaintiffs and Toolights Ruckus, and the correlative professional duties that defendants owned plaintiffs.

---

[7] In response to this appeal, an *amici curiae* brief has been filed in support of the Clinic by the American Kennel Club, the Cat Fanciers' Association, the Animal Health Institute, the American Veterinary Medical Association, the American Animal Hospital Association, the National Animal Interest Alliance, the American Pet Products Association, and the Pet Industry Joint Advisory Council on the issue of emotion-based damages arising out of the provision of veterinary care. The Louisiana Veterinary Medical Association was also granted leave by this court to join in the *amice curiae* brief in support of the Clinic.

**OPINION**

On appeal, a trial court's findings of fact are reviewed pursuant to the manifest error standard of review; thus, the trial court's factual findings will not be set aside in the absence of manifest error or unless they are clearly wrong. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). Where there is conflicting testimony, inferences of fact should not be disturbed upon review even though the reviewing court feels that its own evaluations and inferences are more reasonable. *Id.*; *Stobart v. Dep't. through DOTD*, 617 So.2d 880 (La.1993).

The testimonial evidence and exhibits introduced at trial establish that Mr. and Mrs. Henry were novices in the horse racing business and relied heavily on the Davids for guidance in the decision making process. According to Mr. Henry, ownership of a race horse was more in the line of a part-time business or hobby for him and his wife. He acknowledged that Shawn David, and not his father, had been the principal trainer for the filly. While acknowledging that the original training agreement required he and his wife to pay all veterinary bills and that he left the choice of the veterinarian to be used in treating the filly to his trainer or his assistant, he took the position that Shawn David's authority to authorize veterinary care extended to routine care only. Any care not in the routine category required his advance permission.

Shawn David disagreed with Mr. Henry's assertion that his authority relative to the health of the horse was limited, but suggested that in this case, the procedure was more of the routine category. He described the surgery as a minimally invasive, performance enhancing, routine procedure used to correct soft palate displacement. In his career, he had subjected other horses to this procedure without the owners' objection. The surgical cost for Toolights Ruckus to undergo

5

this surgery was $450.00. Sam David agreed with his son that the procedure was routine and a relatively small procedure. In his career, he had recommended the procedure to owners of other horses he trained and the only objection ever expressed was to the cost.

Mr. Henry's recollection of the April 6, 2008 discussion was that Shawn David not only recommended the surgery, but also informed he and his wife that the training agreement needed to be restructured for them to assume payment of a daily rate to cover the training and feeding of Toolights Ruckus. Mr. Henry testified that he responded by suggesting that he needed time to evaluate other options before he would even consider the surgery, which he testified might include selling the filly or changing trainers. With regard to that conversation, Shawn David testified that Mr. Henry only expressed a concern over the cost of the procedure. According to Shawn David, when Mr. Henry suggested he could not afford the surgery, he offered to pay for the surgery if the Henrys would split the cost for the horse's care until she was able to return to training. He acknowledged that the matter was left open when Mr. Henry stated that he would get back with him concerning the conversation.

According to Shawn David, because Toolights Ruckus was a financial liability when she was not racing, he and his father had a vested interest in returning Toolights Ruckus to the racing circuit as soon as possible. That being the case, he decided to proceed with the surgery and pay for it himself. He testified that when he took the horse to the Clinic, he informed the staff that he would be responsible for the cost of the procedure. Although he denied informing the staff that he owned Toolights Ruckus, he did acknowledge that he referred to her as his horse. He explained that he simply meant to convey the fact that he had a vested

6

interest in the horse to the extent of the cost he and his father has assumed in the training agreement.[8]  Additionally, he testified that it was not uncommon for a trainer to refer to a horse left in his care for training purposes as "his horse."

With regard to ownership determination, Dr. Hill testified that when a horse is first brought to the Clinic, the staff determines the name and address of its owner and records that information in the horse's medical record.  According to Dr. Hill, this information is generally obtained from the trainer and, if the Clinic has a long-standing relationship with a particular trainer, the staff will trust the information provided without further investigation.  On occasion the Clinic staff will check ownership information through the Louisiana Racing Commission, but that is done only when attempting to obtain a billing address or when the staff does not trust the information provided by the trainer.  The doctor acknowledged that the initial medical record established in the Clinic for Toolights Ruckus in November of 2006, listed Mrs. Henry as the owner.  He also acknowledged that the standards of the veterinary profession require that any time anesthesia is contemplated as part of a treatment, the owner's consent be obtained.

Dr. Hill testified that approximately two weeks before the surgery, Shawn David approached him and discussed the nature of the surgery, its cost, and the costs of aftercare.  At that time, Shawn David left him with the impression that he either owned the horse or was in the process of obtaining ownership.  The next time he heard from Shawn David was two weeks later, when he telephoned to schedule the surgery.  On the day prior to the surgery, Dr. Hill traveled to Evangeline Downs Race Track, in St. Landry Parish, and performed all of the pre-surgery testing and completed all of the necessary blood work.  The next day,

---

[8] The evidence sets this cost at $60.00 per day.

according to Dr. Hill, Shawn David delivered Toolights Ruckus to the Clinic and signed the necessary paperwork.

When Shawn David presented Toolights Ruckus to the Clinic for the procedure, his actions, comments, and the long-standing relationship with the Clinic caused the staff to conclude that he now owned the horse. With regard to the trustworthiness of Sam and Shawn David, Dr. Hill testified that the Clinic had a good relationship with the two men and he described them as "good people, good trainers, good horsemen." That being the case, when Shawn David presented the horse to the Clinic and asserted that he was the owner, the staff had no reason to question his assertions or double check ownership with other sources. Given Shawn David's assertions and his agreement to pay the cost of the surgical procedure, the Clinic changed the ownership information on its records to reflect Shawn David as the owner.

The consent form was already filled out when presented to Shawn David, and his name was placed in the line at the top of the form intended for the name of the owner. He did not correct the staff concerning this incorrect information. Instead, he initialed at the appropriate places giving consent for the procedure and signed his name at the bottom of the form indicating that he had read and understood the authorization he had given. Located under the signature line is: "SIGNATURE OF OWNER ____ AGENT ____" so that the person signing the consent could indicate whether he or she was signing it in the capacity as owner or as the owner's agent. Shawn David failed to check either blank.

Dr. Hill did not learn that Shawn David did not own the horse until after the failed surgery. Even then, according to Dr. Hill, Shawn David told him that he owned the filly in partnership with another person. Thus, even at this point, Dr.

Hill was not aware of the actual ownership relationship and that Shawn David had not obtained the permission of the Henrys for the surgery. Shawn David did not completely disagree with Dr. Hill's version of the post-death conversation. He testified that when Dr. Hill called to inform him of Toolights Ruckus' death, he responded by stating that that "[t]his is going to be a mess. I've got to call the owners." He asserted that Dr. Hill responded by saying that, "I thought you owned it. You said, 'It was my horse.'" Shawn David stated that he told Dr. Hill, "It wasn't my horse, one hundred percent ownership. It was my horse in that I made more money from her than – than – normal – ."

Dr. Edward J. Baronne, a retired veterinarian with fifty-one years of experience and the owner of the Clinic, testified that Dr. Hill had no reason to doubt Shawn David's ownership claims. He explained that when a horse is presented for surgery, its chart is filled out indicating ownership, the trainer, and the proposed procedure. Thus, at the time of surgery, the consent form is presented, explained, initialed, and signed by the person presenting the horse. Dr. Baronne testified that he has never, in his experience, had an owner question the trainer's authority to order surgery. Furthermore, if the owner cannot afford the surgery cost, he said that it common for the trainer to take responsibility for payment and then consent to the surgery. Dr. Baronne described this is a perfectly acceptable practice. Finally, he stated that if the Clinic was to check the ownership of every horse presented for surgery, it would have to hire an employee specifically for that duty, which would increase the cost of surgery twenty to twenty-five percent.

As pointed out by the trial court in the written reasons for judgment, the trial testimony establishes "that most of the medical treatment given for equine medical care is given by the trainers and not owners" and that "in most instances it's the

9

trainers who have the day-to-day contact with the veterinarians." Additionally, the trial court found that there exists no proof that the treatment provided Toolights Ruckus by Dr. Hill "fell below the standard of care required in equine veterinary practices." Thus, Mr. Henry's assignments of error boils down to one general question: whether Dr. Hill was reasonable in performing surgery on Toolights Ruckus based on the consent obtained from Shawn David, the assistant trainer, despite the fact that the Clinic's records listed the Henrys as the filly's owner. On this issue, the trial court's factual and legal findings in its well-written reasons for judgment state the following:

> Approximately two weeks prior to the horse being presented for the myectomy, Dr. Hill testified that he had spoken to Shawn David and Shawn had indicated to him that he was in the process of obtaining his own stable and was trying to acquire the horse in question, Toolight [sic] Ruckus.

> The testimony further indicated that on the day that the horse was presented to the Baronne Veterinary Clinic for Dr. Hill to perform the surgery Shawn David had indicated to the personnel at the Baronne Veterinary Clinic that he would be responsible for the medical bills (a deviation from the previous practice) and further told Dr. Joshua Hill and Dr. Edgar Baronne that Toolights Ruckus was "his horse." Furthermore, Shawn David executed a consent form indicating that he was the owner of the horse authorizing the particular non-emergency surgery procedure.

> At trial Shawn David admitted that he presented the horse at the clinic and advised that he was paying for the surgery, and that he told doctors, Hill and Baronne, that the horse was his horse; however, what he meant was not in the sense of ownership but in the sense that he had cared for the horse and the horse was one which he had a particular attachment to, although Shawn did not explain himself fully.

> Shawn David also indicated that several days before bringing the horse in for surgery he had contacted Rick Henry and advised him of the contemplated surgery, the benefits of the surgery. From the testimony it appears that he (Shawn) had a vested interest in seeing that the horse's performance would be improved because of the agreement that he would receive fifty percent of the winnings. Shawn testified that Rick Henry did not tell him "no" but indicated he wanted to speak to his wife and get her permission before the surgery would be under taken. Despite this testimony and without any explanation,

10

Shawn David proceeded to deliver the horse to the clinic for the surgery and it was not until after the surgery that Baronne Clinic was told by Shawn David that there was "another" owner involved and they would have to be notified. At no time before the expiration of the horse on April 8, 2008, was the Baronne Clinic advised that Shawn David was not in fact the owner of the horse.

The plaintiff in this matter maintains that Baronne Clinic should have known that the horse was not Shawn David's because of the registration requirements for ownership of races horses and also the rules of racing requiring the sale transactions and registration of transactions. The Court notes that this body of law that the plaintiff's attempt to rely upon governs and controls the racing of horses and is not particularly applicable to the care of horses.

For the reasons herein after set forth, the Court finds in this matter that the demise of the horse and any negligence in connection therewith lays solely at the feet of Shawn David.

This is a case that is based upon the theory of failure to consent to a surgery procedure and the failure to obtain the necessary consent lies squarely on the shoulders of Shawn David.

If Shawn David gave permission knowing that he was not the owner of the horse and did not have the authority to authorize this particular surgery, then it was an intentional act of deception on Shawn David's part and he would be considered as an intentional tortfeasor responsible to the Henrys for any damages.

On the other hand, if Shawn David was an agent for the Henrys, the issue becomes whether or not he had the apparent authority to act in authorizing or giving consent for the myectomy.

Civil Code Article 2985, provides that a person may represent another person in legal relations as provided by law or by juridical act and this is called representation. Civil Code Article 2988, further provides that the rules of mandate are applicable to representation.

Civil Code Article 2995, provides that the mandatory may perform all acts that are incidental to or necessary for the performance of the mandate and that the authority granted to a mandatory to perform an act that is an ordinary part of his professional calling or an act that follows from the nature of his professional calling need not be specified.

Representation is based in part on the old law of agency and the concept of apparent authority.

From the evidence in this case it appears to the Court that there was a representation between the Henrys and the Davids. The

11

evidence disclosed that all prior veterinarian services before the myectomy and while the horse was owned by the Henrys were requested through the trainer, that Shawn David had trained this horse and had interacted with Dr. Hill prior to the myectomy being performed. Shawn David had indicated he was attempting to acquire the horse while acting as the trainer for the Henrys and furthermore he had the physical possession of the horse when he requested the surgery and signed the consent forms that were required by the Baronne Clinic and proper veterinarian medicine protocols prior to the procedure and there was nothing to indicate that Shawn David was acting outside of the authority that had been given to him or outside of his professional calling.

The testimony at the trial supporting Shawn David's actions was further enhanced by the testimony that most of the medical treatment given for equine medical care is given by the trainers and not owners. The veterinarians stated that in most instances it's the trainers who have the day-to-day contact with the veterinarians and except in very few cases where the owner is also the trainer – vets deal with the trainer.

This Court finds that Shawn David held himself out to be the owner of the horse when it was presented and even if not the owner was known to be the trainer and the party responsible for seeing that medical care was obtained on the horses that he was training.

The other consideration that the Court finds in deciding this case is that under Louisiana Law standards governing medical malpractice actions control in veterinarian malpractice cases, *Ladnier versus Norwood, 781 F. 2d 490, 492 (5th Cir. 1986)*[,] *Carter versus Louisiana State University, 520 So. 2d 383, 387 (La. 1988.)* Looking to the Louisiana Case Law on informed consent the Court in *Lugenbuhl versus Dowling, 96-1757, 701 So. 2d 447 (La. 10/1097)*[,] stated clearly that the rule in a lack of informed consent case. The plaintiff, in a lack of informed consent case, must prove not only that the physician failed to disclose all material information but also that there was a causal relationship between the doctor's failure and the damages claimed by the patient citing *LaCaze versus Collier, 434 So. 2d 1039 (La. 1983)*. Otherwise, the Court found that the doctors conduct, however wrongful, is legally [sic] and inconsequential.

The *Lugenbuhl* Court went on to find that there were two aspects to the proof of causation and the lack of informed consent. First, the plaintiff must prove, as in any other tort action, that the defendant's breach of duty was a cause and fact of the claimed damages or, viewed conversely, that the defendant's proper performance of his or her duty would have prevented the damages; and secondly, that the plaintiff must further prove that a reasonable patient in the plaintiff's position would not have consented to the treatment or procedure had the material information and risk been

disclosed.  Also, see *Hondroulis versus Schuhmacher, 553 So. 2d 398 (La. 1988)*[,] and *Canterbury versus Spence, 464 F. 2d 772, 790 (DC Cir. 1972).*

In this case there was no proof presented by the plaintiffs that the defendants breached a duty which was a cause in fact of the claimed damages.  There was no proof by any expert testimony that the care given by Dr. Hill was below the standard of care required in equine veterinary practices and furthermore, although the language of the cases referred to a patient not consenting to the treatment or procedure there was no proof that in this case the actual owners, the plaintiff Henrys, would not have consented to the treatment.  The testimony was that Mr. Henry was advised and had indicated to Shawn David that he wanted to take some time to talk to his wife about it and this had occurred approximately three days before the procedure and Mr. Henry still had not made his decision known.

There was no testimony unequivocally that the Henrys in this case would not have consented to the myectomy procedure.

Based upon the above the Court in this matter finds that no negligence or liability on the part of Baronne Veterinary Clinic, Dr. Joshua T. Hill or their insurer Zurich American Insurance Company.

We find no error in the trial court's reasons for judgment on this issue and adopt them as our own.  That being the case, we find no merit in the assignments of error asserted in this case.

## DISPOSITION

For the foregoing reasons, we affirm the trial court judgment in favor of the defendants, Joshua T. Hill, D.V.M., Baronne Veterinary Clinic, Inc., and Zurich American Insurance Company, dismissing the claims asserted against the defendants by the plaintiff, Rick Henry, individually and as the executor of the estate of Joanne Henry.  We assess all costs of this appeal to the plaintiff, Rick Henry, individually and as the executor of the estate of Joanne Henry.

**AFFIRMED.**