IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| ROBERT REPIN, | ) | |
| | ) | No. 34049-0-III |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF WASHINGTON; | ) | PUBLISHED OPINION |
| WASHINGTON STATE UNIVERSITY; | ) | |
| AND MARGARET CHON-URBACH, | ) | |
| BVSC; and DOES 1-10, | ) | |
| | ) | |
| Respondents. | ) | |

FEARING, C.J. — Robert Repin sues Washington State University (WSU) and

WSU veterinarian, Dr. Margaret Cohn-Urbach, for conduct arising from the euthanasia of

his beloved Alaskan Malamute, Kaisa. Repin alleges that Cohn-Urbach, with gross

negligence, performed the euthanasia and thereby caused Kaisa pain and prolonged her

death. Cohn-Urbach also purportedly failed to fully inform him of the repercussions of

the method of euthanasia. Repin pleads causes of action in breach of contract, reckless

breach of contract, professional negligence, lack of informed consent/negligent

misrepresentation by omission, intentional or reckless infliction of emotional distress, and

conversion/trespass to chattels or trespass on the case. WSU and Cohn-Urbach moved

for summary judgment to dismiss all claims. The trial court dismissed the lack of informed consent/negligent misrepresentation by omission, intentional and/or reckless infliction of emotional distress, conversion, and trespass claims. The trial court also ruled, as a matter of law, that Repin could not recover emotional distress damages for a reckless breach of contract. We affirm all of the trial court's rulings.

## FACTS

Since the trial court granted WSU and Dr. Margaret Cohn-Urbach (collectively WSU) summary judgment in part, we recount the facts in a light favorable to Robert Repin. This factual statement occasionally, however, adds WSU's version of the facts.

Plaintiff Robert Repin is a single man, with no children, who works as a gold prospector. In 2001, Repin adopted Kaisa, an Alaskan Malamute puppy, who his niece rescued. Kaisa grew to become an indispensable part of Repin's reclusive life.

In September 2012, Kaisa fell ill. After a grim night, Robert Repin took Kaisa to an emergency veterinarian. The veterinarian diagnosed Kaisa with cancer and prescribed medication for her. Repin then transported Kaisa to Kaisa's regular veterinarian, who recommended a visit to the WSU Veterinary Teaching Hospital.

On September 26, Robert Repin drove Kaisa from Cle Elum to Pullman and presented Kaisa to WSU's Veterinary Teaching Hospital. Jasmine Feist and another fourth-year veterinary student registered Kaisa with the hospital. Feist placed Kaisa in

2

the intensive care unit and inserted a catheter in Kaisa's left front leg. Hours later, defendant Dr. Margaret Cohn-Urbach, an intern at the hospital, examined Kaisa. During this time, Repin remained with Kaisa.

Following radiographs, Veterinary Teaching Hospital clinicians diagnosed Kaisa with metastatic cancer. Staff predicted Kaisa would live only several months. Robert Repin insisted on a consultation with an expert. Repin spoke, on the phone, with Dr. Kevin Choy, an oncologist, who agreed with the diagnosis of metastatic cancer. WSU veterinarians recommended euthanasia.

After reflection, Robert Repin directed the Veterinary Teaching Hospital to euthanize Kaisa. Repin viewed the WSU hospital to be the best at veterinary medicine. He did not wish Kaisa to undergo weeks of agony.

Robert Repin requested that he sign paperwork before the euthanasia because he did not trust his mental state after the procedure. He signed a Washington State University Veterinary Teaching Hospital consent for euthanasia form. The form read, in relevant part:

> I, the undersigned, do hereby certify that I am the owner (or duly authorized agent of the owner) of the animal described above; that I hereby give the clinicians of the Washington State University Veterinary Teaching Hospital full and complete authority to humanely destroy the aforementioned animal. . . .
>
> . . . .

3

I hereby release the Washington State University Veterinary Teaching Hospital, their agents, and representatives, from any and all liability for said animal.

Clerk's Papers (CP) at 126. Repin denies seeing the release language because of his distraught state of mind. No hospital employee discussed the language with him. Repin checked the form's box directing Kaisa's remains be returned to him rather than studied at the hospital. Repin paid $260.56 for the euthanasia.

Robert Repin and a Veterinary Teaching Hospital attendant walked Kaisa from the intensive care unit to the euthanasia room, euphemistically labeled the quiet room. Dr. Margaret Cohn-Urbach then described the procedure to Repin. Cohn-Urbach advised that Kaisa would be administered a mild sedative to relax her and thereafter dispensed Euthasol, a drug that would stop the Malamute's heart and allow a peaceful death. According to Dr. Cohn-Urbach, she informed Robert Repin that, as Kaisa passes, she may have deep gasps, tremors, and other adverse effects. Repin claims Cohn-Urbach only warned that Kaisa might take a deep breath and exhibit a slight leg twitch.

Robert Repin laid on the quiet room floor with Kaisa. Dr. Margaret Cohn-Urbach told Robert Repin the hospital procedure would commence. According to Margaret Cohn-Urbach and Jasmine Feist, Feist performed the euthanasia, while Cohn-Urbach supervised. Repin contends that Cohn-Urbach performed the procedure.

According to Robert Repin, he heard Jasmine Feist exclaim: "[O]h, look, Kaisa

4

has chewed off the end of her catheter, should I go get another one?" CP at 62. Margaret

Cohn-Urbach responded: "[N]o. I will show you how to still make this one work." CP at

62. Repin did not look at the catheter and never observed Kaisa chewing the catheter.

Feist and Cohn-Urbach deny any such conversation or Kaisa chewing the catheter.

Robert Repin contends that no hospital staff member flushed the catheter to ensure

patency, a medical term for open or unobstructed. Dr. Margaret Cohn-Urbach and

Jasmine Feist both declare that one of them flushed 20 milliliters (ml) of saline solution

through the catheter. Each avers that the saline flushed unimpeded and that she lacked

any concern regarding patency.

Kaisa slept on the quiet room floor when the veterinarians began the euthanasia.

After the flushing, Either Dr. Margaret Cohn-Urbach or Jasmine Feist injected 1.1 ml of

Acepromazine into the catheter. Five to ten minutes later, either Cohn-Urbach or Feist

started the second injection. Repin turned from observing the injection. Repin describes

the ensuing events:

> [Kaisa] woke up screaming. She was on her feet panicking,
> screaming in agony. I said, What the fuck is going on here? I said, this
> can't fucking be happening. I had to wrestle [Kaisa] back to the floor. I
> had to hold her down and listen to her scream. [Dr. Cohn-Urbach] and
> [Feist] had backed up against the wall. They didn't know what the fuck to
> do. Jasmine said, My God, it's not working. What should we do, she says?
> My dog didn't know what the fuck was going on. She would have tore
> those girls apart if I let go of her. All she knew was she was in fucking
> pain and she wanted to get out of there and I had to hold her down. . . .
> [Feist] said somewhere, What do we do? Should I go get another catheter?

5

> [Dr. Cohn-Urbach] says, I'm out of medication. I said, This can't be fucking happening.

CP at 67-68.

According to Robert Repin, Dr. Margaret Cohn-Urbach left the quiet room and retrieved more Euthasol. Repin believes five to seven minutes passed between the two injections of Euthasol, during which time Kaisa constantly struggled on her two front feet, while Repin toiled to restrain her. Kaisa's agony never ceased. On Cohn-Urbach's return, Repin rolled Kaisa on her back to afford Cohn-Urbach a clear shot at her right forelimb. Jasmine Feist and Repin restrained Kaisa as Cohn-Urbach injected Euthasol into the right forelimb. Fifteen seconds later, Kaisa expired.

According to Jasmine Feist, Kaisa lifted her head and upper torso and uttered one loud howl at the end of the first Euthasol injection. Kaisa did not scream in agony. Dr. Margaret Cohn-Urbach leaped to her feet and exited the quiet room. Robert Repin grabbed Kaisa around the neck and held her. Kaisa lay down and emitted large breaths. Kaisa died after she slouched. Feist estimates Dr. Cohn-Urbach left the room for up to two minutes.

According to Dr. Margaret Cohn-Urbach, Kaisa uttered three howls and gazed at her left leg, which Jasmine Feist handled. Kaisa did not act violently or thrash. As Kaisa reacted, Cohn-Urbach observed Robert Repin's unhappiness. Dr. Cohn-Urbach decided

6

to hurry the euthanasia. She left the quiet room for more Euthasol and returned within two minutes. Cohn-Urbach injected the Euthasol directly into the cephalic vein in Kaisa's right leg. As Dr. Cohn-Urbach administered the second dose of Euthasol, Kaisa howled again. After the second injection, Kaisa died.

After Kaisa expired, Dr. Margaret Cohn-Urbach offered Robert Repin a trash bag for Kaisa's remains, a suggestion that offended Repin. Repin removed Kaisa on a gurney from the Veterinary Teaching Hospital to his car, while colorfully expressing displeasure.

Dr. Margaret Cohn-Urbach wrote in her clinical notes concerning the euthanasia:

> During the euthanasia procedure, Kaisa showed a reaction to the injection of 20ml of Euthasol through an 18G catheter in the left cephalic vein. The catheter was tested prior to injection of the Euthasol and we are confident that it flushed fine. Kaisa only reacted to the injection when the final 1ml was given, and showed no response while the first 19ml Euthasol and 1.1ml Acepromazine were given. As Kaisa was reacting to the injection, we used the right cephalic vein to inject and this was administered smoothly without delay. Kaisa again did show a reaction at the end of the injection of the 15ml Euthasol in the right cephalic vein, even though this was confirmed as definitely being in the vein. The left forelimb did not appear swollen after injection, suggesting that Kaisa may have reacted poorly to the euthanasia due to underlying intracranial and other disease. The owner expressed anger at the situation.

CP at 212-13.

Dr. Harmon Rogers, a colleague of Dr. Margaret Cohn-Urbach, reported to a supervisor:

> At the time of euthanasia the IV catheter looked questionable. Dr. Cohn-Urbach tested it several times and confirmed patency by flushing 20

7

mls of fluid through it. The euthanasia did not go smoothly and the dog cried out while being euthanized. That greatly upset the owner. It is possible that the euthanasia solution was perivascular. Dr. Cohn accessed another vein and completed the euthanasia. She was very apologetic to the owner about the circumstances. I wonder if her apologies increased the owner's dismay and made him believe she was more responsible for the difficulty than might be the case. He left very upset and swearing many times about how she had f'd everything up.

CP at 131. "Perivascular" means tissue surrounding a blood vessel.

In a declaration, Robert Repin affirmed that Dr. Margaret Cohn-Urbach never informed him of the risks of proceeding with a damaged catheter, the use of Acepromazine alone or at an inappropriate dosage, a fourth-year student injecting Euthasol, a high dose of Euthasol, or Kaisa responding to the procedure in distress. Had Cohn-Urbach informed Repin of the risks, he would not have consented to the procedure as performed at the Veterinary Teaching Hospital. He would have instead demanded a different catheter, a proper first medication, a dilution to the Euthasol, and all injections being performed by a licensed veterinarian.

Robert Repin reports severe emotional distress resulting from the painful euthanasia of Kaisa. Repin now lacks patience, easily angers, suffers headaches, and drinks alcohol to sleep.

Robert Repin hired Dr. Victoria Peterson, a licensed Washington veterinarian, as an expert witness. In a declaration opposing WSU's summary judgment motion,

8

Peterson declared that veterinarians act in a fiduciary capacity of trust and confidence. She averred that she knows the standard of care of small animal veterinarians in the State of Washington. Peterson opined that:

> Defendant Cohn-Urbach committed veterinary medical malpractice and breached the contract with Mr. Repin, proximately causing him economic and noneconomic damages. Indeed I find that her acts and omissions were cumulatively reckless and grossly negligent. In short, one does not euthanize a dog by injecting caustic solution outside the vein, causing her to experience tremendous fear and suffer agonizing pain for an extended duration while she is forcibly, physically restrained by the owner until the veterinarian can leave the room to obtain more euthanasia solution and return to administer it properly. That is not euthanasia. It is torturous to both the animal and her owner.

CP at 236.

Dr. Victoria Peterson faulted Dr. Margaret Cohn-Urbach for administering Acepromazine precedent to Euthasol, because the former acts as a tranquilizer, rather than a sedative. A tranquilizer does not alter the dog's perception to the situation, but rather limits her ability to respond. Acepromazine may render the animal more excited, unpredictable, and dangerous. The small dose administered to Kaisa would not have sedated Kaisa or relieved her of any pain. According to Peterson, Margaret Cohn-Urbach was also grossly negligent for administering a large dose of Euthasol because of the age of Kaisa. The drug increased the risk of a geriatric dog's vein bursting such that the caustic solution travels perivascular. Euthanasia requires only 9 ml of Euthasol, but

9

Cohn-Urbach's two injections amounted to 34 ml. Since Kaisa was an Arctic breed, Dr. Cohn-Urbach should have warned Robert Repin that Kaisa would whine and cry upon being euthanized. According to Peterson, Cohn-Urbach's treatment was not humane but led to minutes of conscious pain.

Another of Robert Repin's experts, Dr. Bruce Goldberger, a forensic toxicologist, examined Kaisa's exhumed leg after the animal's death. Goldberger determined that the first injection of Euthasol entered Kaisa's perivascular region, a conclusion consistent with Victoria Peterson's conclusion that Kaisa suffered from the perivascular injection.

PROCEDURE

Robert Repin sues the State of Washington, WSU, and Margaret Cohn-Urbach. We assume that WSU and the State of Washington are the same legal entity. In the complaint, Repin asserts six claims: breach of contract, reckless breach of contract, professional negligence, lack of informed consent/negligent misrepresentation by omission, intentional and/or reckless infliction of emotional distress, conversion/trespass to chattels or trespass on the case. Repin requests reimbursement of amounts billed by WSU for services provided and his emotional distress and loss of enjoyment of life. In seeking emotional distress damages, Repin alleges that the "zone of danger" doctrine applies. CP at 7. We do not read the complaint as seeking any damages for pain suffered by Kaisa.

10

The trial court granted, in part, WSU's motion for summary judgment. The trial court dismissed reckless breach of contract, lack of informed consent/negligent misrepresentation by omission, outrage, and conversion/trespass to chattels. The trial court also dismissed any claim for emotional distress damages no matter the cause of action pled. We granted discretionary review of the trial court's summary judgment rulings.

## LAW AND ANALYSIS

### Reckless Breach of Contract and Noneconomic Damages

We find no case that recognizes a cause of action for reckless breach of contract distinct from a cause of action for breach of contract. We explore, however, whether the law may provide recovery for emotional distress or other noneconomic damages for a breach of contract under some circumstances, including egregious conduct of the breaching party. Robert Repin may allege reckless breach of contract in order to recover noneconomic damages. Repin may also allege reckless breach of contract in order to avoid the release contained in the euthanasia contract. WSU does not assert the defense of the release in support of its summary judgment motion.

The trial court did not dismiss Robert Repin's breach of contract claim. Therefore, we do not address whether Repin maintains a viable claim in contract. We assume that Repin does not seek recovery for the value of Kaisa, since regardless of any

11

professional negligence, Kaisa faced death. We address, however, whether Repin may recover noneconomic damages for the alleged breach of contract.

Robert Repin contends that noneconomic damages should be recoverable when a veterinarian breaches, regardless of reckless conduct, a euthanasia contract because of the distressful nature of euthanasia. He emphasizes, however, that more reason exists to allow emotional distress damages on a reckless breach of a euthanasia contract. WSU responds that Washington courts have not recognized recovery of emotional distress damages for breach of a contract, even where emotional distress is foreseeable.

In general, parties cannot recover noneconomic, emotional disturbance damages for breach of contract. RESTATEMENT (SECOND) OF CONTRACTS § 353 (Am. Law Inst. 1981); *Gaglidari v. Denny's Restaurants, Inc.*, 117 Wn.2d 426, 440-48, 815 P.2d 1362 (1991). An exception arises if "the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result." RESTATEMENT (SECOND) OF CONTRACTS § 353. The comments explore this exception:

> Common examples are contracts of carriers and innkeepers with passengers and guests, contracts for the carriage or proper disposition of dead bodies, and contracts for the delivery of messages concerning death. Breach of such a contract is particularly likely to cause serious emotional disturbance. Breach of other types of contracts, resulting for example in sudden impoverishment or bankruptcy, may by chance cause even more severe emotional disturbance, but, if the contract is not one where this was a particularly likely risk, there is no recovery for such disturbance.

RESTATEMENT (SECOND) OF CONTRACTS § 353 cmt. a.

12

Both parties cite extensively to *Gaglidari*. Repin argues that *Gaglidari* embraced a broadened understanding of recovery for emotional damages in breach of contract cases. WSU responds this is a complete misstatement of *Gaglidari*, which did not expand recovery for breach of contract.

In *Gaglidari v. Denny's Restaurants, Inc.*, 117 Wn.2d 426 (1991), Denny's hired Ronda Gaglidari, in 1980, to be a bartender for their Tukwila store. A fight broke out at the Denny's restraunt. Denny's fired Gaglidari as a result of the altercation. Gaglidari sued Denny's for, among other things, breach of contract. Following a trial, the jury returned a verdict awarding Gaglidari $55,000 in economic damages and $75,000 in noneconomic damages. Denny's appealed. The Washington Supreme Court determined that it was inappropriate to award emotional distress damages in this context. In doing so, the court explored Washington common law, other states' common law, public policy, and the *Restatement of Contracts*. The court wrote:

> . . . [B]y allowing emotional damages whenever they are a foreseeable result of the breach, the traditional predictability and economic efficiency associated with contract damages would be destroyed. In order to avoid the unpredictable and destabilizing results of such an approach, most courts have generally limited emotional distress damages to contracts uniquely intended to protect some personal interest or security and which are incapable of compensation by reference to the terms of the contract.
>
> . . . .
>
> It is easily predictable there would be a jury issue on emotional distress in nearly every employee discharge case and in fact nearly every breach of contract case. The contractual consensus of the parties will

13

become secondary to an action in tort. This will represent a profound change in the law, the implication of which probably can be explained only by adverting to the "Law of Unintended Consequences." If there is to be a change in the common law, we believe a more prudential approach would be for the Legislature to consider the matter prior to such a change occurring.

*Gaglidari*, 117 Wn.2d 446, 448.

In 2013, this court decided the more analogous *Hendrickson v. Tender Care Animal Hospital, Corp.*, 176 Wn. App. 757, 312 P.3d 52 (2013). In *Hendrickson*, Julie Hendrickson brought her golden retriever, Bear, to Tender Care for neutering and implanting of a microchip. Following the procedure, veterinarian Kristen Cage noticed Bear's abdomen as swollen. Cage ordered x-rays to rule out gastric dilation volvulus. When Cage examined Bear's x-rays, she noticed significant gastric distention but no volvulus. Tender Care sent Bear home with instructions on how to treat gastric distention. Bear eventually died, likely from gastric dilation volvulus. Hendrickson sued Tender Care, in part, for reckless breach of bailment contract. The trial court dismissed the reckless breach of bailment contract and emotional distress damages. This court affirmed. This court wrote:

[A]lthough the Washington cases Hendrickson cites recognize the existence of emotional suffering resulting from the injury to or loss of a companion animal, those cases uniformly recognize the historic treatment of those animals as property under Washington law and the limitation on emotional distress damages for such injury except in cases of malicious or intentional infliction of injury to those animals. In fact, Hendrickson has failed to submit, and this court is not aware of, any Washington case

14

applying the *Restatement* rule and creating a claim for emotional distress damages arising out of a contract action.

*Hendrickson*, 176 Wn. App. at 767.

Robert Repin cites to cases from Michigan and Louisiana to support his contention that he can recover emotional distress damages for breach of contract. *Lane v. KinderCare Learning Centers, Inc.*, 231 Mich. App. 689, 588 N.W.2d 715 (1998); *Smith v. University Animal Clinic, Inc.*, 09-745 (La. App. 3 Cir. 2/10/10), 30 So. 3d 1154; *Barrios v. Safeway Insurance Co.*, 2011-1028 (La. App. 4 Cir. 3/21/12), 97 So. 3d 1019. Louisiana law lacks persuasive authority because its Napoleonic code allows recovery of damages in breach of contract for nonpecuniary losses. LOUISIANA CIVIL CODE art. 1998. The Michigan decision helps Repin some, but we remain bound by Washington precedence. Under Washington law, recovery of emotional disturbance damages for breach of contract is generally not recoverable. Therefore, the trial court did not err in limiting Repin's potential recovery for breach of contract to economic damages.

Professional Negligence, Noneconomic Damages, and Zone of Danger

The trial court did not dismiss Robert Repin's claim for veterinarian negligence, but ruled that Robert Repin cannot recover for his emotional distress under this cause of action. On appeal, Repin argues that the trial court erred in denying him recovery of noneconomic damages based on his position in the "zone of danger" of the traumatic

incident of Kaisa's painful death and based on the theory of negligent infliction of emotional distress. We address each argument separately starting with the zone of danger doctrine.

In 1962, the Washington Supreme Court adopted a zone of danger test to determine whether a bystander may recover for emotional distress caused by the defendant's negligence. *Murphy v. City of Tacoma*, 60 Wn.2d 603, 620-21, 374 P.2d 976 (1962). With the adoption of this criterion, the plaintiff need not establish physical impact to her body in order to recover for emotional distress. Nevertheless, the "zone of danger" measure requires either an immediate physical invasion of the plaintiff's person or security or a direct possibility of such an invasion in order that recovery may be had for mental anguish. *Murphy v. City of Tacoma*, 60 Wn.2d at 620-21.

Under the later creation of a cause of action for negligent infliction of emotional distress, Washington recognized a broader rule whereby the bystander may recover for emotional distress regardless of the possibility of invasion of her body space. *Hunsley v. Giard*, 87 Wn.2d 424, 435, 553 P.2d 1096 (1976); *Hegel v. McMahon*, 136 Wn.2d 122, 126, 960 P.2d 424 (1998). The zone of danger doctrine still holds relevance, however. Under the zone of danger standard, the plaintiff need not prove objective symptoms to recover emotional distress damages. *Wilson v. Key Tronic Corp.*, 40 Wn. App. 802, 809-10, 701 P.2d 518 (1985); *McRae v. Bolstad*, 32 Wn. App. 173, 178, 646 P.2d 771 (1982)

16

*aff'd*, 101 Wn.2d 161, 676 P.2d 496 (1984). A plaintiff, in a negligent infliction of emotional distress cause of action, must establish objective symptomatology. *Corrigal v. Ball and Dodd Funeral Home, Inc.*, 89 Wn.2d 959, 962, 577 P.2d 580 (1978); *Hunsley v. Giard*, 87 Wn.2d at 436 (1976); *Wilson v. Key Tronic Corp.*, 40 Wn. App. at 810.

Robert Repin claims he lodged within the zone of danger because he watched his beloved Malamute experience an agonizing death and because the conduct exposed him to grievous bodily harm from Kaisa. We explore these alternate contentions in such order. If he is correct with regard to either contention, he need not show objective symptoms of emotional distress.

Washington has never addressed the applicability of the zone of danger rule to a medical or veterinarian malpractice claim. Other jurisdictions deny such a claim. We follow the other American jurisdictions.

In *Owens v. Childrens Memorial Hospital, Omaha, Nebraska*, 480 F.2d 465 (8th Cir. 1973), parents alleged that health care providers at the defendant hospital negligently diagnosed and treated their son. They asserted that they remained in close proximity to their son throughout the period of his hospitalization and that they personally witnessed the malpractice of the providers and the physical and mental suffering of their son. They further alleged that, as a direct and proximate result of the negligence, they suffered physical and mental anguish, great emotional disturbance, and shock to their respective

17

nervous systems. The reviewing court affirmed the lower court's dismissal on the pleadings. The court reasoned in part that the parents were not within the zone of physical danger. The court was reluctant to extend the liability of health care providers beyond the patient.

In *Squeo v. Norwalk Hosp. Association*, 316 Conn. 558, 113 A.3d 932 (2015), parents brought action against a nurse and the hospital for medical malpractice, alleging that the defendants negligently discharged their suicidal son after the nurse conducted an emergency psychiatric examination. The parents found the son hanging in their front yard. The Connecticut court affirmed summary judgment dismissal of the claim. The court noted that bystander medical malpractice claims will rarely if ever arise under a zone of danger rule, as it is the rare form of medical malpractice that would pose a physical threat to bystanders.

Finally in *Edinburg Hospital Authority v. Trevino*, 941 S.W.2d 76 (Tex. 1997), Oscar Trevino alleged that he suffered severe mental anguish after witnessing the negligent treatment of his wife. Trevino argued that he should be permitted to recover mental anguish damages against the hospital as a bystander to the wife's treatment. The Texas high court denied recovery, in part, from fear that hospitals might curtail patient visitation to prevent bystander suits. The very nature of medical treatment is traumatic to the layperson. Even when a medical procedure proves beneficial to the patient, the

18

procedure may shock the senses of the ordinary bystander who witnesses it.

We note that California and New Jersey promote a contrary view. *Ochoa v. Superior Court*, 39 Cal.3d 159, 703 P.2d 1, 216 Cal. Rptr. 661 (1985); *Gendek v. Poblete*, 139 N.J. 291, 654 A.2d 970 (1995). Nevertheless, other courts allow recovery for only those bystanders who are within the zone of danger and suffer emotional distress as a result of a reasonable fear of a physical injury to themselves, a factor we discuss below. *Asaro v. Cardinal Glennon Memorial Hospital*, 799 S.W.2d 595, 599 (Mo. 1990); *Vaillancourt v. Medical Center Hospital of Vermont, Inc.*, 139 Vt. 138, 425 A.2d 92, 95 (1980). We accept the reasoning employed in Texas, Connecticut, and Nebraska.

We might reverse dismissal of the negligence claim based on Robert Repin's fear for his own physical safety. Nevertheless, Repin presents no evidence of such fear. CR 56(e) reads, in pertinent part:

> . . . an adverse party may not rest upon the mere allegations or denials of a pleading, but a response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

A complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

In his testimony, Robert Repin mentioned that he needed to wrestle Kaisa to the

19

floor. Dr. Margaret Cohn-Urbach and Jasmine Feist cowered against the wall. Kaisa would have attacked the two women if Repin did not restrain her. Repin did not testify of any fear that Kaisa would harm him. He failed to place himself in a zone of danger. Therefore, as a matter of law, he cannot sustain a claim for his emotional distress resulting from WSU's alleged professional negligence.

Negligent Infliction of Emotional Distress

Robert Repin does not expressly plead a cause of action for negligent infliction of emotional distress. Therefore, WSU contends that Repin may not claim error on appeal for a phantom claim. In response, Repin urges us to review a claim for negligent infliction because WSU did not assert this contention before the trial court. We disagree. WSU asserted this argument in its trial court reply brief. We note that an issue raised and argued for the first time in a reply brief is generally too late to warrant consideration. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). Nevertheless, WSU may have lacked knowledge of Repin's asserting the claim until Repin filed his memorandum responding to WSU's summary judgment motion.

WSU's attempt to preclude consideration of any cause of action for negligent infliction of emotional distress begs several questions. Is a claim for negligent infliction of emotional distress encompassed in a claim for negligence? Should WSU, before Robert Repin filed his brief responding to WSU's summary judgment motion, have

20

known that Repin sought to recover for negligent infliction of emotional distress? May the trial court allow an implied amendment, pursuant to CR 15(b), when the plaintiff raises a new cause of action in a summary judgment response brief? We decide to ignore these questions and address whether Repin identified facts sufficient to sustain a negligent infliction of emotional distress claim in response to WSU's summary judgment motion. We rule in favor of WSU on this issue so the university suffers no prejudice by addressing the merits of the claim.

The tort of negligent infliction of emotional distress encompasses three elements: (1) the emotional distress is within the scope of foreseeable harm of the negligent conduct, (2) the plaintiff reasonably reacted given the circumstances, and (3) objective symptomatology confirms the distress. *Bylsma v. Burger King Corp.*, 176 Wn.2d 555, 560, 293 P.3d 1168 (2013). Under the tort, a plaintiff who suffers mental distress without physical injury may have a cause of action. *Hunsley v. Giard*, 87 Wn.2d at 431; *Pickford v. Masion*, 124 Wn. App. 257, 259, 98 P.3d 1232 (2004). No absolute boundary surrounds the class of persons whose peril may stimulate the mental distress. *Hunsley v. Giard*, 87 Wn.2d at 436.

We focus on the third element of the tort of negligent infliction of emotional distress. According to the third element, a plaintiff must prove he suffered emotional distress by objective symptomatology and the emotional distress must be susceptible to

21

medical diagnosis and proved through medical evidence. *Kloepfel v. Bokor*, 149 Wn.2d 192, 196-97, 66 P.3d 630 (2003); *Hegel v. McMahon*, 136 Wn.2d at 134-35.

In response to a summary judgment motion, the adverse party may not rest on the mere allegations or denials of a pleading, but a response by affidavits must present specific facts showing a genuine issue for trial. CR 56(e). In response to WSU's summary judgment motion, Robert Repin omitted any facts showing objective symptoms of stress.

WSU also argues that Washington law refuses to extend the cause of action for negligent infliction of emotional distress to distress suffered due to injury to a pet. For example, in *Pickford v. Masion*, 124 Wn. App. 257 (2004), this court denied recovery to a pet owner, whose dog was mauled by other dogs, of damages for emotional distress and loss of the human-animal companionship. Gina Pickford alleged negligent and malicious infliction of emotional distress. *Hendrickson v. Tender Care Animal Hospital Corp.*, 176 Wn. App. 757 (2013) and *Sherman v. Kissinger*, 146 Wn. App. 855, 873, 195 P.3d 539 (2008) also appear to follow a strict rule that denies a pet owner emotional distress damages for loss of a human-animal bond based on the negligent death or injury to a pet. We do not know if this rule extends to emotional distress suffered as a result of observing one's pet suffer. Nevertheless, we need not base our decision on the nature of Robert Repin's claim. Robert Repin provides no evidence of objective symptomatology.

22

Outrage

Robert Repin contends that the trial court erred in dismissing his outrage claim. WSU argues that Repin failed to establish that WSU's conduct was outrageous as a matter of law. We agree with WSU.

The tort of outrage is synonymous with a cause of action for intentional infliction of emotional distress. *Kloepfel v. Bokor*, 149 Wn.2d 192, 194-95 (2003); *Snyder v. Medical Service Corp. of Eastern Washington*, 145 Wn.2d 233, 250, 35 P.3d 1158 (2001). In order to make a prima facie case of intentional infliction of emotional distress, a plaintiff seeking to survive summary judgment must produce evidence showing three elements: (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) actual result to the plaintiff of severe emotional distress. *Kloepfel v. Bokor*, 149 Wn.2d at 195 (2003); *Grimsby v. Samson*, 85 Wn.2d 52, 59, 530 P.2d 291 (1975). Contrary to negligent infliction of emotional distress, the plaintiff need not establish objective symptomatology of the distress. *Kloepfel v. Bokor*, 149 Wn.2d at 196-98. The law assumes that intentional, rather than negligent, conduct of the defendant leads to severe emotional distress. *Kloepfel v. Bokor*, 149 Wn.2d at 202.

Under Washington law, a pet owner may have no right to emotional distress damages or damages for loss of a human-animal bond based on the negligent death or injury to a pet. *Sherman v. Kissinger*, 146 Wn. App. at 873 (2008). Nevertheless,

23

recovery for emotional distress is possible for malicious or intentional injury to a pet. *Womack v. Von Rardon*, 133 Wn. App. 254, 263, 135 P.3d 542 (2006); *Pickford v. Masion*, 124 Wn. App. at 261 (2004).

This appeal focuses on element one of the tort. Extreme and outrageous conduct must be conduct that the recitation of the facts to an average member of the community would arouse his resentment against the actor and lead him to exclaim "Outrageous!" *Kloepfel v. Bokor*, 149 Wn.2d at 196; *Reid v. Pierce County*, 136 Wn.2d 195, 201-02, 961 P.2d 333 (1998); *Grimsby v. Samson*, 85 Wn.2d at 59 (1975). Liability exists only when the conduct has been so outrageous in character and extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community. *Grimsby*, 85 Wn.2d at 59.

Generally, the elements of a claim for intentional infliction of emotional distress are questions of fact. *Strong v. Terrell*, 147 Wn. App. 376, 385, 195 P.3d 977 (2008). On summary judgment, however, a trial court must make an initial determination as to whether the conduct may reasonably be regarded as so extreme and outrageous as to warrant a factual determination by the jury. *Sutton v. Tacoma School District No. 10*, 180 Wn. App. 859, 869, 324 P.3d 763 (2014); *Strong v. Terrell*, 147 Wn. App. at 385. No case suggests that the standard to defeat a summary judgment motion is harsher for plaintiffs asserting outrage claims than plaintiffs in other tort suits. Nevertheless,

24

Washington courts, like other courts, have considered themselves gatekeepers for purposes of allowing a jury to decide claims of intentional infliction of emotional distress. *Christian v. Tohmeh*, 191 Wn. App. 709, 736, 366 P.3d 16 (2015), *review denied*, 185 Wn.2d 1035, 377 P.3d 744 (2016). The trial court and, in turn, the appeals court, renders an initial screening to determine whether the defendant's conduct and mental state, together with the plaintiff's mental distress, rise to the level necessary to make out a prima facie case. *Benoy v. Simons*, 66 Wn. App. 56, 63, 831 P.2d 167 (1992); *Orwick v. Fox*, 65 Wn. App. 71, 87-88, 828 P.2d 12 (1992). The requirement of outrageousness is not an easy one to meet. *Christian v. Tohmeh*, 191 Wn. App. at 736. The level of outrageousness required is extremely high. *Reigel v. SavaSeniorCare LLC*, 292 P.3d 977, 990 (Colo. Ct. App. 2011).

Washington may be the only jurisdiction with a reported decision involving a claim for outrage attended to veterinarian care. *Baechler v. Beaunaux*, 167 Wn. App. 128, 272 P.3d 277 (2012). Nevertheless, this court affirmed with little discussion the trial court's summary dismissal of the claim because the claimant presented no evidence that the defendant veterinarian violated the standard of care. So, we evaluate Robert Repin's cause of action for outrage by reviewing decisions involving physicians.

In *Benoy v. Simons*, 66 Wn. App. 56 (1992), Saundra Benoy sued neonatologist Robert Simon for intentional infliction of emotional distress. Benoy gave birth to a

25

severely disabled premature child at Kadlec Medical Center in Richland, where Dr. Simon provided care. When the infant's condition deteriorated, Dr. Simon transferred him to Children's Orthopedic Hospital in Seattle, where the boy later died. Benoy contended that Simon needlessly pressured her family to create a guardianship, maintained the infant needlessly on life support, led her to believe her son's condition improved when it deteriorated, told her to bring her son's body home on a bus, and billed her for needless care. This court affirmed summary judgment in favor of Dr. Simon. Even assuming the events occurred as described by Benoy, the physician's conduct did not fall within the perimeters of outrageous conduct.

In *Christian v. Tohmeh*, 191 Wn. App. 709 (2015), Diane Christian presented evidence that Dr. Antoine Tohmeh engaged in a pattern of intentional behavior to obfuscate a true diagnosis of Christian's neurological deficits in an attempt to avoid legal liability; referred Christian to a neurologist but not ordering nerve conductions studies at the level of spine of her pain; yelled and shouted at her; told Christian that she had no neurological deficits, her problems were all in her head, and whatever was wrong would have happened anyway; implied to Christian that she was lazy and obese; spoke angrily to Christian's later treating physician and attempted to influence the physician's diagnosis; told the second physician that Christian suffered from significant emotional or psychological issues that rendered Christian's history less valid; and referred Christian to

26

a urologist, who found a neurogenic bladder, yet told Christian that the urologist's findings were normal. This court affirmed a summary judgment dismissal of the claim against Dr. Tomeh. In doing so, we reviewed decisions, from other jurisdictions, in which the appellate courts also dismissed claims of outrage against a physician. *Reigel v. SavaSeniorCare LLC*, 292 P.3d 977 (Colo. Ct. App. 2011); *Cangemi v. Advocate South Suburban Hospital*, 364 Ill. App. 3d 446, 845 N.E.2d 792, 300 Ill. Dec. 903 (2006); *Harris v. Kreutzer*, 271 Va. 188, 624 S.E.2d 24 (2006); *Hart v. Child's Nursing Home Co.*, 298 A.D.2d 721, 749 N.Y.S.2d 297 (2002); *Albert v. Solimon*, 252 A.D.2d 139, 684 N.Y.S.2d 375 (1998), *aff'd*, 94 N.Y.2d 771, 721 N.E.2d 17, 699 N.Y.S.2d 1 (1999); *C.M. v. Tomball Regional Hospital*, 961 S.W.2d 236 (Tex. App. 1997).

The conduct of Dr. Margaret Cohn-Urbach, viewed in a light most beneficial to Robert Repin, at best shows gross negligence. None of the conduct leads to a reasonable person uttering "outrageous." We conclude that Repin has failed to show outrageous conduct.

## Trespass to Chattels

Robert Repin argues that he established a prima facie case for an intentional tort along the trespass-conversion spectrum. We are unacquainted with such a spectrum so we address each theory separately beginning with trespass.

27

In his brief, Robert Repin cites only *Restatement (Second) Torts* §§ 226, 227, and 228 (Am. Law Inst. 1965) in his discussion about trespass and conversion. Each *Restatement* section concerns conversion alone. Although we recognize a cause of action for trespass to chattel, Repin cites no authority to support a claim for trespass to chattel under the circumstances on appeal. Therefore, we affirm the summary judgment dismissal of the claim.

RAP 10.3(a)(6) directs each party to supply, in his brief, "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." This court does not review errors alleged but not supported with citation to authority. *Valente v. Bailey*, 74 Wn.2d 857, 858, 447 P.2d 589 (1968); *Meeks v. Meeks*, 61 Wn.2d 697, 698, 379 P.2d 982 (1963); *Avellaneda v. State*, 167 Wn. App. 474, 485 n.5, 273 P.3d 477 (2012). Appellate courts are precluded from considering such alleged errors. *Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 689 n.4, 974 P.2d 836 (1999); *Escude v. King County Public Hospital District No. 2*, 117 Wn. App. 183, 190 n.4, 69 P.3d 895 (2003).

### Conversion

Robert Repin argues that Dr. Margaret Cohn-Urbach without authorization intermeddled with his property rights in Kaisa in a manner inconsistent with his express and contracted instructions to humanely euthanize Kaisa. Under Repin's version of the

28

facts, Dr. Cohn-Urbach utilized a damaged catheter and pompously admonished Jasmine Feist to complete the euthanasia with the impaired instrument. Repin argues that Cohn-Urbach's insistence on use of the compromised catheter constituted an intentional act that caused the Euthasol to enter Kaisa's perivascular region with the result of tremendous pain to the Malamute. His physician and veterinarian experts support this claim. According to Repin, Cohn-Urbach's actions deprived both Kaisa and Repin of the expected results of euthanasia.

Robert Repin further argues that the fundamental nature of his transaction with WSU was to destroy his property in a humane manner and without undue pain and suffering according to sound veterinary principles. The euthanasia form signed by Repin authorized the Veterinarian Teaching Hospital to humanely destroy Kaisa. When WSU failed to fulfill this purpose, the veterinarian hospital converted Repin's property, Kaisa.

WSU argues that Repin's authorization of the demise of Kaisa thwarts a cause of action for conversion. WSU emphasizes the nebulous nature of Repin's claim.

We must decide if a veterinarian commits a conversion in the civil law when the veterinarian engages in gross negligence during treatment of a companion animal or when the veterinarian disobeys instructions for care of the animal. We find no case law directly applicable. Because we conclude that Robert Repin's claim does not fulfill the letter or purpose behind the cause of action for conversion, we reject his claim for

29

conversion as a matter of law.

Under modern jurisprudence, conversion is the unjustified, willful interference with a chattel that deprives a person entitled to the property of possession. *Potter v. Washington State Patrol*, 165 Wn.2d 67, 78, 196 P.3d 691 (2008); *In re Marriage of Langham & Kolde*, 153 Wn.2d 553, 564, 106 P.3d 212 (2005). Conversion is the act of willfully interfering with any chattel, without lawful justification, whereby any person entitled thereto is deprived of the possession of it. *Washington State Bank v. Medalia Healthcare LLC*, 96 Wn. App. 547, 554, 984 P.2d 1041 (1999); *Consulting Overseas Management, Ltd. v. Shtikel*, 105 Wn. App. 80, 83, 18 P.3d 1144 (2001).

An essential element of conversion is the taking of possession, actual or constructive, of the chattel. *Martin v. Sikes*, 38 Wn.2d 274, 287, 229 P.2d 546 (1951). In its ordinary sense, conversion means to take and keep another's property. *Hess v. Starwich*, 149 Wash. 679, 684, 272 P. 75 (1928). Nevertheless, even a willful or an unlawful taking will not always amount to conversion. *Clark v. Groger*, 102 Wash. 188, 194, 172 P. 1164 (1918). There must be some assertion of right or title hostile to the true owner. *Clark v. Groger*, 102 Wash. at 194.

We observe that the essence of conversion is the dispossession of property from the rightful owner. We note that Robert Repin lay next to or held Kaisa during the euthanasia. Dr. Margaret Cohn-Urbach never sought title or possession of the Malamute.

30

Repin never relinquished possession of Kaisa. Although Repin strongly objects to the care given by Cohn-Urbach, he agreed to some care being given.

The most analogous Washington decision involving care of a companion animal is *Sherman v. Kissinger*, 146 Wn. App. 855 (2008). Nevertheless, *Sherman* provides no legal assistance. Arlene Sherman brought her dog Ruby to a veterinarian hospital to obtain a urine sample to determine if Ruby suffered from a urinary infection. The hospital receptionist informed Sherman that the hospital would collect the urine sample by placing a sheath under Ruby's cage. Nevertheless, veterinarian Jennifer Kissinger took the sample by inserting a needle into the urinary bladder. No one warned Sherman of the use of a needle. When inserting the needle, the veterinarian drew blood, rather than urine. Kissinger immediately removed the needle, applied pressure to the puncture area, and returned Ruby to her cage. Ruby died one minute later. Sherman sued for breach of bailment contract, negligent misrepresentation, conversion, trespass to chattels, and breach of fiduciary duty. The trial court dismissed on the ground that the medical malpractice act, chapter 7.70 RCW, controlled and did not afford recovery for Sherman's claims. This court reversed and held that the act does not apply to veterinarians and veterinary clinics. We reinstated all claims, including the claim for conversion. But we qualified the holding by observing that we did not decide whether any of the claims were viable.

31

Washington courts have never applied those sections of *Restatement (Second) of Torts* addressing conversion, but both Robert Repin and WSU cite some of those sections. To excuse its conduct, WSU relies on *Restatement (Second) of Torts* § 252, which reads:

> One who would otherwise be liable to another for trespass to a chattel or for conversion is not liable to the extent that the other has effectively consented to the interference with his rights.

Robert Repin counters with a different section of the *Restatement*.

> One who is authorized to make a particular use of a chattel, and uses it in a manner exceeding the authorization, is subject to liability for conversion to another whose right to control the use of the chattel is thereby seriously violated.

RESTATEMENT (SECOND) OF TORTS § 228.

*Restatement (Second) of Torts* § 228 lists many examples in an attempt to breathe living meaning into the static words of the section. None of the examples given under § 228, however, concern gross negligence or failure to follow contract instructions when caring for an animal. None of the examples involve the owner of the property retaining possession of the property while the defendant performs services on the property. The examples involve putting the chattel to a significant use other than authorized, such as one renting a car that ferries passengers, but using the car to haul heavy freight. In all examples, the defendant exclusively possessed the chattel and applied the chattel to her

32

own use. Dr. Margaret Cohn-Urbach never sought to use Kaisa for her own pleasure. Cohn-Urbach never assumed complete physical control of Kaisa.

Although more than a century old, the Washington case most analogous in which the court reviewed the law of conversion is *Spokane Grain Co. v. Great Northern Express Co.*, 55 Wash. 545, 104 P. 794 (1909). The grain company hired the defendant railway to transport fourteen horses from St. Paul to Seattle. The grain company provided its own car for the journey. During the trip, hay in the horse car caught fire and seriously injured two horses. The grain company later blamed the fire on sparks from the train's engine. The railway company blamed the fire on the faulty car provided by the grain company. During a stop in Spokane, the railway company removed the two horses to attend to their injuries. One horse died within days. The other horse recovered and completed the train trek to Seattle. The grain company sued the railway company for conversion of the two horses. The trial court denied a directed verdict requested by the railway. The jury awarded the grain company $360.

On appeal, the Great Northern Express Company argued that no evidence supported a claim for conversion. The Supreme Court agreed, reversed the verdict, and directed judgment for the railway. The Supreme Court observed that the grain company might have a claim for negligence against the railway in conducting the train or caring for the horses or a claim for breach of contract, but not for conversion. The railway never

33

sought title to the horses or to permanently deprive the grain company of possession of the equines.

## Lack of Informed Consent

Robert Repin's complaint pleads as one cause of action "lack of informed consent/negligent misrepresentation by omission." We know of no such conglomerated cause of action. We do not consider the sum of the stated cause of action to be greater than its parts. We analyze the pled cause of action's constituent parts as separate causes of action.

Robert Repin contends that lack of informed consent in the context of veterinary care is a creature of common law and its lack of codification does not affect its vitality. He testified that he would not have authorized the methods employed by the Veterinary Teaching Hospital such as veterinary student injections, use of Acepromazine alone and in an insufficient dose, failure to flush the catheter, use of a damaged catheter, administration of Euthasol perivascularly, and a failure to store a second dose of Euthasol in the quiet room for a hasty second injection. WSU argues that lack of informed consent does not exist in the context of veterinary practice. We agree with WSU.

RCW 7.70.050 recognizes a duty of a physician to inform a human patient of material facts relating to treatment, and the statute acknowledges a cause of action for informed consent. Robert Repin recognizes that chapter 7.70 RCW, addressing actions

34

for injury resulting from health care, does not apply to claims against veterinarians. *Sherman v. Kissinger*, 146 Wn. App. at 869 (2008). Repin instead contends that a claim for informed consent arises from common law, the health care act codified the claim in the context of human care, and the act imposes no restrictions on an informed consent claim against a veterinarian. We agree with the first two arguments. We must decide if Washington recognizes a claim for lack of informed consent for animal health care treatment.

Robert Repin concedes that no Washington decision recognizes a cause of action for informed consent in the setting of animal treatment. He contends that other jurisdictions recognize the claim. We question this argument.

Robert Repin cites *Henry v. Zurich American Insurance Co.*, 2012-888 (La. Ct. App. 3 Cir. 2/6/13), 107 So. 3d 874. The *Henry* court recognized that its courts had held that the standards in medical malpractice actions controlled veterinarian malpractice cases. Nevertheless, Louisiana's Napoleonic code expressly incorporated medical malpractice standards to veterinarian malpractice suits. The owners of a horse sued a veterinarian after a minor surgery that led to the death of the equine. The horse's trainer, not the owners, consented to treatment. The owners sought liability against the veterinarian for failing to obtain their consent to the surgery. The trial court ruled in favor of the veterinarian, and the appellate court affirmed. Both courts noted that the

35

owners presented no proof that the veterinarian's care fell below the standard of care, and the owners omitted any testimony that they would not have consented to the procedure if granted an opportunity to consent. The court assumed that the doctrine of informed consent applied to suits against a veterinarian. Nevertheless, the claim surrounded the alleged failure to gain any consent, not a failure of the veterinarian to disclose material risks, the heart of an informed consent claim.

Robert Repin also cites *Zimmerman v. Robertson*, 259 Mont. 105, 854 P.2d 338 (1993). During trial, the other Robert Zimmerman attempted to question the defendant veterinarian on whether the veterinarian obtained Zimmerman's informed consent to an allegedly risky surgery. The trial court excluded testimony on informed consent because Zimmerman failed to plead a cause of action for informed consent and pleading medical malpractice did not suffice. The Montana court never directly addressed whether the owner of an animal can maintain a cause of action for informed consent.

Next Robert Repin cites *Hoffa v. Bimes*, 954 A.2d 1241 (Pa. Super. 2008). Robert Hoffa sued a veterinarian who performed an abdominal tap on Hoffa's horse. Like *Henry v. Zurich American Insurance Co.*, the claim surrounded the lack of any consent rather than informed consent. The court dismissed the claim because the veterinarian performed the tap in an emergency. The court never expressly adopted informed consent in the context of a claim against a veterinarian.

*Loman v. Freeman*, 375 Ill. App. 3d 445, 874 N.E.2d 542, 314 Ill. Dec. 446 (2006), *aff'd*, 229 Ill. 2d 104, 890 N.E.2d 446, 321 Ill. Dec. 724 (2008) also involves the failure to garner any consent for surgery on a horse. Unreported cases cited by Robert Repin do not necessarily support his position either. We choose not to rely on unreported decisions anyway.

We recognize sound reasons for permitting a claim for informed consent when the veterinarian fails to divulge relevant facts. Veterinarian literature encourages practitioners to disclose pertinent information to an animal's owner before prescribing and performing treatment. One's autonomy by virtue of being human, a rationale behind informed consent, may not be a concern. Nevertheless, veterinarians should be encouraged to disclose material risks so an owner may make informed decisions regarding the care of companion animals.

As noted by Robert Repin, Washington licenses veterinarians similar to the manner by which it licenses health care providers for humans. Chapter 18.92 RCW. Veterinary science is a profession, the practice of which includes prescribing or administering drugs, performing operations, and applying treatments in order to cure. RCW 18.92.010; *Baechler v. Beaunaux*, 167 Wn. App. 128 (2012).

Still, the principle rationale of patient sovereignty behind informed consent clumsily fits in the context of animal care. Under the doctrine of informed consent, a

37

health care provider has a fiduciary duty to disclose relevant facts about the patient's condition and the proposed course of treatment so that the patient may exercise the right to make an informed health care decision. *Stewart-Graves v. Vaughn*, 162 Wn.2d 115, 122, 170 P.3d 1151 (2007). The doctrine of informed consent refers to the requirement that a physician, before obtaining the consent of his or her patient to treatment, inform the patient of the treatment's attendant risks. *Crawford v. Wojnas*, 51 Wn. App. 781, 782, 754 P.2d 1302 (1988). The doctrine is premised on the fundamental principle that every human being of adult years and sound mind has a right to determine what shall be done with his own body. *Crawford v. Wojnas*, 51 Wn. App. at 782-83; *Schloendorff v. Society of New York Hospital*, 211 N.Y. 125, 129, 105 N.E. 92 (1914), *abrogated on other grounds by Bing v. Thunig*, 2 N.Y.2d 656, 143 N.E.2d 3, 163 N.Y.S.2d 3 (1957). A necessary corollary to this principle is that the individual be given sufficient information to make an intelligent decision. *Smith v. Shannon*, 100 Wn.2d 26, 29-30, 666 P.2d 351 (1983); *Canterbury v. Spence*, 150 U.S. App. D.C. 263, 464 F.2d 772, 783 (1972). In *Crawford v. Wojnas*, this court denied a mother's informed consent claim against a physician, who administered a vaccination to the mother's child, because the duty to disclose was only for the child, the patient.

In the context of veterinarian care, the party suing is not the patient. The sentient being undergoing the treatment lacks the ability to reason and decide a course of care.

38

We also find that no foreign state has definitively adopted informed consent as a cause of action against a veterinarian.

We recognize that novelty does not necessarily prevent an intermediate appeals court from the application of a cause of action never recognized in this State. *Hoffman v. Dautel*, 189 Kan. 165, 168, 368 P.2d 57 (1962). Nevertheless, we proceed with the utmost caution and deliberateness in the face of such a request. *Hester v. Hubert Vester Ford, Inc.*, 239 N.C. App. 22, 31, 767 S.E.2d 129 (2015). We consider the expansion of duties under the law to be better addressed by our Supreme Court or the legislature, who can engage in a cost-benefit analysis to determine if public policy warrants the expansion. *Ritchie v. Rupe*, 443 S.W.3d 856, 878 (Tex. 2014). We encourage our Supreme Court, in the appropriate case, to determine whether to permit a claim against a veterinarian for failure to obtain informed consent from an animal's owner.

Negligent Misrepresentation by Omission

Robert Repin argues that he presented facts supporting a case for negligent misrepresentation by omission. He argues that, because of a fiduciary or special relationship between Kaisa and him, on the one hand, and Dr. Margaret Cohn-Urbach, on the other hand, Cohn-Urbach held a duty to affirmatively disclose information concerning the proposed course of treatment. WSU contends that Repin's negligent misrepresentation by omission claim fails as matter of law because an omission alone

39

cannot constitute negligent misrepresentation. We decline to apply this theory because WSU did not deal with Robert Repin in the course of the latter's business.

Under Washington law, a plaintiff claiming negligent misrepresentation must prove by clear, cogent, and convincing evidence that (1) the defendant supplied information for the guidance of another in his or her business transactions, (2) the information was false, (3) the defendant knew or should have known that the information was supplied to guide the plaintiff in his or her business transactions, (4) the defendant was negligent in obtaining or communicating the false information, (5) the plaintiff relied on the false information, (6) the plaintiff's reliance was reasonable, and (7) the false information proximately caused the plaintiff damages. *Ross v. Kirner*, 162 Wn.2d 493, 499, 172 P.3d 701 (2007).

Robert Repin emphasizes *Restatement (Second) of Torts* § 551 (Am. Law Inst. 1977), which creates a duty to disclose under certain fiduciary situations. Nevertheless, negligent misrepresentation under section 551 invokes the duty to disclose only in terms of a business transaction. *Colonial Imports v. Carlton Northwest, Inc.*, 121 Wn.2d 726, 731, 853 P.2d 913 (1993). Liability is further limited by section 551(2) to those situations when business advice is given by one who proclaims expertise or has a financial stake in the matter under consideration. *Colonial Imports v. Carlton Northwest,*

No. 34049-0-III
*Repin v. State of Washington*

*Inc.*, 121 Wn.2d at 732; *Richland School District v. Mabton School District*, 111 Wn. App. 377, 386, 45 P.3d 580 (2002).

We find no case in which negligent misrepresentation by omission has been applied in the context of veterinarian services. Dr. Margaret Cohn-Urbach did not provide financial information or advice to Robert Repin. Repin's business did not include raising dogs.

## CONCLUSION

We affirm all rulings of the trial court. We remand the case to the superior court for further proceedings on those claims not dismissed on summary judgment.

Fearing, C.J.

WE CONCUR:

Korsmo, J.

Lawrence-Berrey, J.

41

No. 34049-0-III

FEARING, C.J. (concurring) — *Gentlemen of the Jury: The best friend a man has in this world may turn against him and become his enemy. His son or daughter that he has reared with loving care may prove ungrateful. Those who are nearest and dearest to us, those whom we trust with our happiness and our good name, may become traitors to their faith. The money that a man has he may lose. It flies away from him perhaps when he needs it most. A man's reputation may be sacrificed in a moment of ill-considered action. The people who are prone to fall on their knees to do us honor when success is with us, may be the first to throw the stones of malice when failure settles its cloud upon our heads. The one absolutely unselfish friend that a man can have in this selfish world, the one that never deserts him, the one that never proves ungrateful or treacherous, is his dog.*

Closing argument of U.S. Senator George Vest, *Burden v. Hornsby* (1870).

I write this concurring opinion to advocate a change in the law. Principles underlying the law of damages for breach of contract and values basic to the law of negligent infliction of emotional distress call for an award of emotional distress damages to the owner of a companion animal when a veterinarian commits malpractice and breaches the implied covenant of competent care in the treatment of the pet. Unfortunately, Washington law has strayed from these principles and values by jaundicely viewing pets as just another piece of personal property. I am bound by earlier Washington Supreme Court and Court of Appeals decisions to affirm denial to Robert

Repin of emotional distress damages, but I recommend our state Supreme Court's consideration of our ruling. I do not recommend any changes to the law with regard to commercial animals.

## Breach of Contract Damages

As noted in the majority opinion, in general, parties cannot recover noneconomic, emotional disturbance, damages for breach of contract. RESTATEMENT (SECOND) OF CONTRACTS § 353 (Am. Law Inst. 1981); *Gaglidari v. Denny's Restaurants, Inc.*, 117 Wn.2d 426, 440-48, 815 P.2d 1362 (1991). Nevertheless, under the *Restatement*, an exception arises if "the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result." RESTATEMENT (SECOND) OF CONTRACTS § 353.

No Washington court has expressly adopted *Restatement (Second) of Contracts* § 353. Nevertheless, the Washington Supreme Court in *Gaglidari v. Denny's Restaurants, Inc.*, 117 Wn.2d 426, and the Court of Appeals in *Hendrickson v. Tender Care Animal Hospital, Corp.*, 176 Wn. App. 757, 312 P.3d 52 (2013) discussed the section as if Washington had adopted it. Washington courts have adopted or acknowledged other sections of *Restatement (Second) of Contracts*. Some examples are *Restatement (Second)* § 90 in *Greaves v. Medical Imaging Systems, Inc.*, 124 Wn.2d 389, 398, 879 P.2d 276 (1994); § 151 in *Chemical Bank v. Washington Public Power Supply System*, 102 Wn.2d 874, 898-99, 691 P.2d 524 (1984), and *Scott v. Petett*, 63 Wn. App.

50, 58, 816 P.2d 1229 (1991); § 261 in *Washington State Hop Producers, Inc. Liquidation Trust v. Goschie Farms, Inc.*, 112 Wn.2d 694, 707, 773 P.2d 70 (1989); § 265 in *Washington State Hop Producers, Inc. Liquidation Trust v. Goschie Farms, Inc.*, 112 Wn.2d at 696; § 347 in *Eastlake Construction Co., Inc. v. Hess*, 102 Wn.2d 30, 46, 686 P.2d 465 (1984); § 348 in *Eastlake Construction Co., Inc. v. Hess*, 102 Wn.2d at 47; § 371 in *Young v. Young*, 164 Wn.2d 477, 487-88, 191 P.3d 1258 (2008); and § 374 in *Ducolon Mechanical, Inc. v. Shinstine/Forness, Inc.*, 77 Wn. App. 707, 711, 893 P.2d 1127 (1995).

The comments to *Restatement (Second) of Contracts* § 353 read, in part:

> Common examples are contracts of carriers and innkeepers with passengers and guests, contracts for the carriage or proper disposition of dead bodies, and contracts for the delivery of messages concerning death. Breach of such a contract is particularly likely to cause serious emotional disturbance. Breach of other types of contracts, resulting for example in sudden impoverishment or bankruptcy, may by chance cause even more severe emotional disturbance, but, if the contract is not one where this was a particularly likely risk, there is no recovery for such disturbance.

RESTATEMENT (SECOND) OF CONTRACTS § 353 cmt. a.

The *Restatement*'s historic examples of contracts of carriers and innkeepers with passengers and guests may be outdated. Few, if any, recent cases award a passenger of a common carrier or guest of a hotel emotional distress damages for break of contract. As to carriers, the federal ICC Termination Act of 1995 will likely bar any claim against a motor carrier for emotional distress. 49 U.S.C. § 14706; *Moffit v. Bekins Van Lines Co.*,

3

6 F.3d 305, 306-07 (5th Cir. 1993). Other federal law will, in turn, likely bar any claim against an air carrier for emotional distress damages. 49 U.S.C. § 41713; *Tobin v. Federal Express Corp.*, 775 F.3d 448, 452 (1st Cir. 2014). As to innkeepers, the hotel owner may still remain subject to emotional distress damages for breach of contract. *Amick v. BM & KM, Inc.*, 275 F. Supp. 2d 1378 (N.D. Ga. 2003) (applying Georgia law); *Dold v. Outrigger Hotel*, 54 Haw. 18, 501 P.2d 368 (1972), *overruled*, *Francis v. Lee Enterprises, Inc.*, 89 Haw. 234, 971 P.2d 707 (1999).

Regardless of the current state of the law regarding common carriers and hoteliers, more reason exists to allow the owner of a pet to recover for emotional distress resulting from the negligence of a veterinarian's causing death or injury to the companion animal. Breach of contract by the veterinarian will likely cause serious emotional disturbance or at least more so than contract breaches by innkeepers and carriers. The veterinarian knows of the bond between a human being and his companion animal and the trauma resulting from a breach of the contract to competently care for the pet.

As discussed in the majority opinion, *Gaglidari v. Denny's Restaurants, Inc.*, 117 Wn.2d 426 (1991) is a principal Washington decision involving recovery of emotional distress damages for breach of contract. Ronda Gaglidari sued Denny's for breach of an employment contract. The Washington Supreme Court reversed a jury award of emotional distress damages. The court wrote:

4

. . . [B]y allowing emotional damages whenever they are a foreseeable result of the breach, the traditional predictability and economic efficiency associated with contract damages would be destroyed. In order to avoid the unpredictable and destabilizing results of such an approach, most courts have generally limited emotional distress damages to contracts uniquely intended to protect some personal interest or security and which are incapable of compensation by reference to the terms of the contract.

. . . .

It is easily predictable there would be a jury issue on emotional distress in nearly every employee discharge case and in fact nearly every breach of contract case. The contractual consensus of the parties will become secondary to an action in tort. This will represent a profound change in the law, the implication of which probably can be explained only by adverting to the "Law of Unintended Consequences." If there is to be a change in the common law, we believe a more prudential approach would be for the Legislature to consider the matter prior to such a change occurring.

*Gaglidari*, 117 Wn.2d at 446, 448.

One flaw in *Gaglidari v. Denny's Restaurants, Inc.*, is that a discharged employee nearly always now sues in tort, regardless of whether the employee adds a claim in contract, such that most every employee discharge case now entails a jury question of emotional distress. More importantly, the *Gaglidari* court wished to limit emotional distress damages to contracts uniquely intended to protect some personal interest or security and which are incapable of compensation by reference to the terms of the contract. The court does not define a contract intended to protect "some personal interest." The court may have pondered contracts wherein the breach may defame the plaintiff or injure his or her status in the community or contracts that concern the psyche of the plaintiff such as counseling contracts.

5

Regardless, pet owners hold a personal interest, not simply an economic interest, in companion animals. Pets possess an enormous hold on Washington residents, as illustrated by Kaisa being the sole companion of Robert Repin. Washingtonians devote hours to walking, playing, feeding, stroking, and caring for pets. Washingtonians mourn the death of a pet. In turn, pets return hours of love, devotion and companionship to owners. Veterinarians know well the devotion that owners possess toward pets. Small animal veterinarians uncynically and legitimately make money from this devotion.

According to the American Pet Products Association, total pet industry expenditures in the United States reached $60.28 billion in 2015. Americans spent a total of $23.05 billion on pet food, $14.28 billion on supplies and medicine, $15.42 billion on veterinarian care, $2.12 billion on live animal purchases, and $5.41 billion on pet services like grooming and boarding. *Pet Industry Market Size & Ownership Statistics*, AM. PET PRODS. ASS'N, http://americanpetproducts.org/press_industrytrends.asp [https://perma.cc/QP5H-WE94]. According to a report by the Bureau of Labor Statistics, on average, each U.S. household spent over $500 on pets in 2015. Amelia Josephson, *The Economics of the Pet Industry*, SMARTASSET (Dec. 25, 2015), https://smartasset.com/personal-finance/the-economics-of-the-pet-industry [https://perma.cc/JLP9-LNW9]. Since some households lack a pet, those households with pets spend on average more than $500 per year.

*Hendrickson v. Tender Care Animal Hospital, Corp.*, 176 Wn. App. 757 (2013) is

6

an indistinguishable decision that we follow. The *Hendrickson* court summarily dismissed Julie Hendrickson's claim for emotional distress damages resulting from the death of her pet dog during the care by a veterinarian. A primary rationale behind the court's ruling was the historic treatment of animals as any other article of personal property. 176 Wn. App. at 767. This historic treatment now belies reality.

Many decisions, including Washington decisions, recognize the bond between animal and human and the intrinsic and inestimable value of a companion animal. "We recognize that the bond between pet and owner often runs deep and that many people consider pets part of the family." *Mansour v. King County*, 131 Wn. App. 255, 265, 128 P.3d 1241 (2006). Harm may be caused to a person's emotional well-being by malicious injury to that person's pet as personal property. *Womack v. Von Rardon*, 133 Wn. App. 254, 263-64, 135 P.3d 542 (2006). "Pickford, with good reason, maintains that Buddy is much more than a piece of property; we agree." *Pickford v. Masion*, 124 Wn. App. 257, 263, 98 P.3d 1232 (2004).

> Here, first, the private interest involved is the owners' interest in keeping their pets. This is greater than a mere economic interest, for pets are not fungible. So the private interest at stake is great.

*Rhoades v. City of Battle Ground*, 115 Wn. App. 752, 766, 63 P.3d 142 (2002).

Foreign decisions echo this sentiment. The emotional attachment to a family's dog is not comparable to a possessory interest in furniture. *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 975 (9th Cir. 2005). Pets are

7

not inanimate objects, and an emotional bond exists between some pets and their owners. *Barrios v. Safeway Insurance Co.*, 2011-1028 (La. App. 4 Cir. 3/21/12), 97 So. 3d 1019, 1023-24.

The other concurring opinion mentions two typical objections to judicial changes in the law. First, this court should leave any changes to the state legislature. The flaw in this argument lies in the fact that the judiciary, without input from the legislature, created the rule denying emotional distress damages for breach of veterinarian contracts. The rule conflicts with underlying legal principles. Therefore, the courts, not the legislature, should correct the error and align the rule with the underlying principles.

The legislature has never addressed whether pet owners may recover emotional distress damages. When no statute in this state examines a subject matter, it is both appropriate and proper that the courts decide the question. *In re Welfare of Bowman*, 94 Wn.2d 407, 420, 617 P.2d 731 (1980).

Second, the other concurring opinion worries about harm to the veterinarian profession and the end to some veterinarians' practices. Nevertheless, one may recover emotional distress damages against physicians and lawyers. *Harbeson v. Parke-Davis, Inc.*, 98 Wn.2d 460, 477, 656 P.2d 483 (1983) (physician); *Paul v. Judicial Watch, Inc.*, 543 F. Supp. 2d 1, 7 (D.D.C. 2008) (attorney); *Gillespie v. Klun*, 406 N.W.2d 547, 558 (Minn. Ct. App. 1987) (attorney); *McAlister v. Slosberg*, 658 A.2d 658, 660 (Me. 1995) (attorney); *In re Jackson*, 92 B.R. 987, 999 (Bankr. E.D. Pa. 1988) (attorney);

8

*Wagenmann v. Adams*, 829 F.2d 196, 221 (1st Cir. 1987) (attorney). The availability of

such damages has not irreparably harmed these or other professions. The noble

veterinarian profession deserves no protections denied other professions.

Negligent Infliction of Emotional Distress

I agree with Washington law's requirement that, to recover in negligent infliction

of emotional distress, the plaintiff must show objective symptomatology and the

emotional distress must be susceptible to medical diagnosis and proved through medical

evidence. *Kloepfel v. Bokor*, 149 Wn.2d 192, 196-97, 66 P.3d 630 (2003); *Hegel v.

McMahon*, 136 Wn.2d 122, 135, 960 P.2d 424 (1998). The majority opinion denies

Robert Repin recovery in negligent infliction of emotional distress based on the absence

of medically documented objective symptomatology.

I criticize current Washington law in that state law may impose a strict prohibition

on a pet owner recovering emotional distress damages for loss of a human-animal bond

based on the negligent death or injury to a pet. *Sherman v. Kissinger*, 146 Wn. App. 855,

873, 195 P.3d 539 (2008); *Pickford v. Masion*, 124 Wn. App. 257 (2004). No reason

exists to distinguish between emotional distress suffered from the death or serious injury

to a pet and emotional distress suffered from other events caused by the negligence of a

defendant.

At least one Washington decision recognizes the harm that may be caused to a

person's emotional well-being by malicious injury to that person's pet. *Womack v. Von*

9

No. 34049-0-III
*Repin v. State of Washington* (concurring)

*Rardon*, 133 Wn. App. at 264 (2006).  Because of the role of pets in our society, this

recognition should extend to instances of negligent injury.

_____
Fearing, C.J.

No. 34049-0-III

LAWRENCE-BERREY, J. (concurring) — Current law that requires dismissal should not be judicially changed. To subject veterinarians to a claim for a pet owner's emotional distress damages would have profound societal effects. It would likely put many veterinarians out of business, it would sharply increase veterinarian bills for pet owners, and it would result in veterinarians refusing to perform emergency operations.

Our concurring brother dismisses these concerns, in part, by noting how well physicians have adjusted to increased damage awards. Increased damage awards against physicians are funded by increased medical insurance rates, which in turn are funded by several millions of people who pay medical insurance. Pet owners, however, pay veterinarian bills from their pockets. Because pet owners generally do not (or cannot) buy pet insurance, increased veterinarian costs cannot be funded in the same manner as increased physician costs. We are confident that veterinarians would not fare as well as physicians if Washington was to permit recovery of emotional damages for pet owners. Nevertheless, we should leave it for the legislature to weigh the benefits and costs of such a rule. *See Gaglidari v. Denny's Restaurants, Inc.*, 117 Wn.2d 426, 448, 815 P.2d 1362 (1991).

Lawrence-Berrey, J.

I CONCUR:

Korsmo, J.