**FILED**
**MAY 30, 2024**
In the Office of the Clerk of Court
WA State Court of Appeals Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| TORY GOMSRUD and JEREMY GOMSRUD, | ) ) ) | No. 39676-2-III |
| Petitioners, | ) ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| DANIEL R. CAMPEAU, and marital community of DANIEL R. CAMPEAU, and MELANIE CAMPEAU, | ) ) ) ) ) | |
| Respondents. | ) | |

COONEY, J. — Jeremy and Tory Gomsrud (Gomsruds) sued Daniel Campeau and Melanie Campeau (Campeaus) after Mr. Campeau shot and killed their dog. On the Campeau's motion for summary judgment, the superior court dismissed the Gomsruds' claims for conversion, reckless or intentional infliction of emotional distress, and malicious injury to a pet.

On appeal, the Gomsruds challenge the superior court's application of RCW 16.08.020, dismissal of their claims, and holding that noneconomic damages are not cognizable for trespass to chattel or conversion.

We hold that Mr. Campeau presented sufficient evidence that the dog he witnessed harassing his chickens was "chasing" them but not "injuring" them within the meaning of

RCW 16.08.020. As to the dismissal of the Gomsruds' claims for conversion, reckless infliction of emotional distress, and malicious injury to pet claims, we affirm. Finally, we hold that emotional distress damages are available for the Gomsruds' trespass to chattel claim.

## BACKGROUND

The Campeaus, Kimberly Hipner, and Simona Long are neighbors. Ms. Hipner's property lies between the Campeaus and the Longs. The Gomsruds are friends with the Longs and would occasionally visit them at their property with their dog, Rainier, and their daughter, Emma.

Mr. Campeau keeps chickens on his property, primarily for their egg production. Mr. Campeau has a gated enclosure for his chickens bounded by "deer fencing." Clerk's Papers (CP) at 172. Ms. Hipner also kept chickens in a coop on her property. In 2018, after Mr. Campeau lost his flock of chickens to a dog attack, he and Ms. Hipner entered into the following agreement titled "General Affidavit:"

> PERSONALLY came and appeared before me, the undersigned Notary, the within named Kimberly I. Hipner and Daniel R. Campeau, who are residents of Yakima County, State of Washington, and makes this his/her statement and General Affidavit upon oath and affirmation of belief and personal knowledge that the following matters, facts and things set forth are true and correct to the best of his/her knowledge:
>
> I Kimberly I Hipner have given Daniel R. Campeau permission to help me care take [sic] my land/buildings and all that this entails, Security of premise ingress and regress of all property boundaries against predators, illegal activities, harm to livestock. Location of this premise is as follows:

2

> 1550 Old Cowiche rd. Tieton Washington, 98947.  This agreement to commence on June 16, 2018.  This agreement between the above listed parties will remain in affect [sic] until such time as both parties agree to dissolve the above agreement.

CP at 61 (some capitalization omitted).  The General Affidavit was signed by both Ms. Hipner and Mr. Campeau and notarized.

INCIDENT

Mr. Campeau stated that in the early morning hours of July 24, 2021, he saw what appeared to be a dog in his backyard.  He noticed the dog again around "dawn" that same morning "lunging" at his chicken coop.  CP at 40.  Later that morning, Ms. Hipner informed Mr. Campeau that her chickens were gone and presumed dead.

In the early afternoon, Mr. and Mrs. Gomsrud, along with their daughter Emma, and their dog Rainier, traveled from Seattle to visit the Longs.  They arrived at the Longs at approximately 12:30 p.m.  After working on a lawnmower, Mr. Gomsrud and Mr. Long began pulling fence posts along the border of the Long's property, directly adjacent to Ms. Hipner's property.

Meanwhile, Rainier was sniffing near a wood pile on Ms. Hipner's property along the Long-Hipner property line.  Mr. Gomsrud and Mr. Long heard a gunshot, and then heard Rainier cry out, followed by three more gunshots.  Mr. Gomsrud and Mr. Long ran to Rainier, who had already succumbed to her injuries.  Ms. Hipner and Mr. Campeau, who was carrying a rifle, walked over to Mr. Gomsrud and Mr. Long.  Mr. Campeau

3

claimed he shot Rainier because he saw her at his chicken enclosure harassing his chickens about 30 to 40 seconds before he shot her.

Mr. Gomsrud and Mr. Long buried Rainier's remains on the Long's property. Mr. Gomsrud told his daughter Emma what had happened and she was "emotionally devasted." CP at 143. The Gomsruds enlisted a counselor for Emma to help her "process her complicated feelings about Rainier's heedless death." *Id*.

The day after Rainier was killed, Mr. Campeau reported that one of his chickens, which had become very "despondent" following its harassment by the dog, was dead on the floor of the coop. CP at 36-37. Mr. Campeau also reported that his chickens became "skittish" and did not produce eggs "for several days after the incident." CP at 38, 86.

LAWSUIT AND SUMMARY JUDGMENT

The Gomsruds filed a lawsuit against the Campeaus alleging conversion, trespass to chattel, malicious injury to a pet, intentional or reckless infliction of emotional distress, and property damage for Mr. Campeau's killing of Rainier.

The Campeaus moved for summary judgment dismissal of the Gomsruds' claims based on their contention that RCW 16.08.020 permitted Mr. Campeau to dispatch Rainier under the circumstances. RCW 16.08.020 is a statutory defense that allows a person to kill any dog that he or she sees "chasing, biting, injuring or killing" livestock,

including chickens, "on any real property owned or leased by, or under the control" of that person. RCW 16.08.020.

In addition to arguing that all of the Gomsruds' claims should be dismissed under RCW 16.08.020, Mr. Campeau argued that the Gomsruds' claim for intentional or reckless infliction of emotional distress must be dismissed because Mr. Campeau's conduct was not outrageous as a matter of law. Further, Mr. Campeau argued that the Gomsruds' malicious injury to pet claim must be dismissed absent evidence of malice.

Finally, Mr. Campeau claimed that "chickens can in fact be scared to death," that was confirmed when one of his chickens expired the day after the incident. CP at 87. He alleged in his motion for summary judgment that though "[t]here was no other physical injury to Mr. Campeau's chickens" the birds "were stressed and . . . stress to a chicken is an injury." *Id.*

The Gomsruds opposed the motion arguing that the dog Mr. Campeau saw near his chicken enclosure was not "chasing" his chickens or "injuring" them within the meaning of the statute, that Mr. Campeau did not have "control" of the property on which Rainier was shot (Ms. Hipner's property), and that RCW 16.08.020 required proof of "'reasonable necessity.'" CP at 115-16. The Gomsruds also argued that Rainier could not have been the dog Mr. Campeau saw near his chicken enclosure in the early morning

5

hours because Rainier was never on Mr. Campeau's property and did not arrive at the Longs until 12:30 p.m.

The Gomsruds further argued that their intentional or reckless infliction of emotional distress claims remained viable because Mr. Campeau's actions were outrageous, and the Gomsruds experienced foreseeable emotional distress. As to the malicious injury to pet claim, the Gomsruds argued that a reasonable fact-finder could conclude that Mr. Campeau's actions were done with malice.

Finally, the Gomsruds argued that Mr. Campeau's "lay opinion is inadmissible under ER 702-04 to support any causal connection" between the dog's harassment of the chickens and why one chicken died. CP at 120. They argued that the chicken's death was never confirmed by any medical evidence and that Mr. Campeau could not opine as to why the chickens became despondent.

After considering the evidence on summary judgment, the trial court concluded that:

> 6. Mr. Campeau possesses requisite skill to offer an admissible expert opinion on causation of injury to his chickens so as to overcome Plaintiffs' objection under ER 702, which this court overrules and deems admissible under CR 56.
>
> . . . .
>
> 7. Whether the factfinder concludes it was Rainier or not, the animal Mr. Campeau saw as described in findings 2 and 3 above, was "chasing" so as to fall within RCW 16.08.020.

6

8.   Whether the factfinder concludes it was Rainier or not, the animal Mr. Campeau saw as described in findings 2 and 3 above, was "injuring" so as to fall within RCW 16.08.020.

9.   The common law doctrine of "reasonable necessity" does not apply to RCW 16.08.020.

10.  Plaintiffs' claim Mr. Campeau's actions constituted malicious injury to a pet. . . .  [T]he Court finds [Mr. Campeau's] actions were without malice.  Therefore, the malicious injury to pet claim is hereby dismissed with prejudice.

11.  Plaintiffs alleged the theory of intentional infliction of emotional distress, but conceded in their briefing that Mr. Campeau did not act with the intention of inflicting emotional distress on the Plaintiffs. Therefore, the intentional infliction of emotional distress claim is hereby dismissed with prejudice.

12.  Plaintiffs also allege the theory of reckless infliction of emotional distress, sometimes referred to as the tort of outrage. . . .  The problem for Plaintiffs is that the Restatement (Second) Torts, sect. 46, requires that the conduct be directed at the person injured, or toward another "person".  Mr. Campeau's actions undeniably were not directed at the Plaintiffs, but at their dog.  A dog is not a person, even though Plaintiffs try to characterize the dog as a member of the Plaintiffs' "immediate family". . . .  Therefore, Plaintiff's claim for outrage is hereby dismissed with prejudice.

CP at 306-08.  The court declined to dismiss the Gomsruds' conversion, trespass to chattel, or property damage claims at this stage.

Later, Mr. Campeau brought a motion for partial summary judgment seeking dismissal of the Gomsruds' conversion claim on the basis that Mr. Campeau never took title to Rainier.  Mr. Campeau also sought a ruling from the court that emotional distress damages were unavailable for the Gomsruds' conversion and trespass to chattel claims.

7

The court concluded that the Gomsruds' "claim for conversion is not cognizable on these facts" and dismissed the claim. CP at 362. The court also concluded that the Gomsruds were not "entitled to emotional distress damages as a matter of law for the claims of conversion and trespass to chattels." *Id*.

The Gomsruds appeal.

ANALYSIS

The Gomsruds present four issues for review: (1) whether the Campeaus can assert the defense of RCW 16.08.020; (2) whether Mr. Campeau was qualified to offer expert testimony on the cause of death or injuries his chickens suffered; (3) whether their conversion, reckless infliction of emotional distress, and malicious injury to pet claims were improperly dismissed; and (4) whether they should be permitted to seek damages for emotional distress flowing from their conversion and trespass to chattel claims.

I. APPLICABILITY OF RCW 16.08.020

The Gomsruds argue the court erred when it concluded that the Campeaus had alleged facts sufficient to raise RCW 16.08.020 as a defense at trial. Specifically, the Gomsruds contend Mr. Campeau failed to present evidence that his chickens were being "chased" or "injured" as those terms are used in the statute. They further contend that Mr. Campeau was not qualified to offer an expert opinion regarding the causation of the "injuries" to his chickens. The Gomsruds also argue the court erred when it concluded

8

that the doctrine "of 'reasonable necessity' does not apply to RCW 16.08.020." CP at 307. Finally, the Gomsruds claim Mr. Campeau was not in "control" of Ms. Hipner's property within the meaning of RCW 16.08.020. Thus, the Gomsruds contend RCW 16.08.020 is not an affirmative defense in this case.

We disagree with the Gomsruds' arguments and hold that Mr. Campeau has produced sufficient evidence to entitle him to raise the defense provided in RCW 16.08.020. With this holding, we need not decide whether Mr. Campeau was qualified to opine as to the cause of his chickens' alleged injuries or death.

This court reviews orders on summary judgment de novo, engaging in the same inquiry as the trial court. *Keck v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). Summary judgment is appropriate only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.*; CR 56(c). The moving party bears the initial burden of establishing that there are no disputed issues of material fact. *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). "A material fact is one upon which the outcome of the litigation depends in whole or in part." *Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 516, 799 P.2d 250 (1990).

When considering a motion for summary judgment, evidence is considered in a light most favorable to the nonmoving party. *Keck*, 184 Wn.2d at 370. If the moving

9

party satisfies its burden, then the burden shifts to the nonmoving party to establish there is a genuine issue for the trier of fact. *Young*, 112 Wn.2d at 226. While questions of fact typically are left to the trial process, they may be treated as a matter of law if "reasonable minds could reach but one conclusion." *Hartley v. State*, 103 Wn.2d 768, 775, 698 P.2d 77 (1985).

Further, a nonmoving party may not rely on speculation or having its own affidavits accepted at face value. *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986). Instead, a nonmoving party must put "forth specific facts that sufficiently rebut the moving party's contentions and disclose that a genuine issue as to a material fact exists." *Id.*

A. WHETHER "REASONABLE NECESSITY" IS AN ELEMENT OF RCW 16.08.020

The Gomsruds argue that RCW 16.08.020 provides a defense to Mr. Campeau's shooting of Rainier only if he satisfies the additional common law requirement of "reasonable necessity." The Gomsruds further contend that if "reasonable necessity" is not an element of RCW 16.08.020, the statute is in derogation of the common law and must be strictly construed. We disagree with both arguments.

RCW 16.08.020 reads:

> *It shall be lawful for any person who shall see any dog or dogs chasing, biting, injuring or killing any sheep, swine or other domestic animal, including poultry, belonging to such person, on any real property owned or*

10

> *leased by, or under the control of, such person, or on any public highway,*
> *to kill such dog or dogs*, and it shall be the duty of the owner or keeper of
> any dog or dogs so found chasing, biting or injuring any domestic animal,
> including poultry, upon being notified of that fact by the owner of such
> domestic animals or poultry, to thereafter keep such dog or dogs in leash or
> confined upon the premises of the owner or keeper thereof, and in case any
> such owner or keeper of a dog or dogs shall fail or neglect to comply with
> the provisions of this section, it shall be lawful for the owner of such
> domestic animals or poultry to kill such dog or dogs found running at large.

(Emphasis added.)

The court in its order on Mr. Campeau's motion for summary judgment stated: "The common law doctrine of 'reasonable necessity' does not apply to RCW 16.08.020." CP at 307.

In *State v. Wilson*, Division Two of this court held that the common law doctrine of "reasonable necessity" is not an element of RCW 16.08.020. 10 Wn. App. 2d 719, 728, 450 P.3d 187 (2019). In *Wilson*, the defendant was attempting to use RCW 16.08.020 as a statutory defense to the crime of animal cruelty, but the reasoning in *Wilson* nevertheless applies under these facts.

The court in *Wilson* reasoned that "[a] 'reasonably necessary' requirement cannot be treated as a fourth requirement for the application of RCW 16.08.020 for two reasons." *Id*. First, the court distinguished the State's cited cases, which included *State v. Burk*, 114 Wash. 370, 195 P. 16 (1921), and *Drolet v. Armstrong*, 141 Wash. 654, 252 P. 96 (1927); the same cases the Gomsruds rely on to support the same proposition.

11

*Wilson*, 10 Wn. App. 2d at 728. The court stated that *Burk* and *Drolet* did "not address

RCW 16.08.020 or its predecessor statutes." *Id.* Instead, "[t]he court in *Burk* identified a

*constitutional* right to shoot animals to protect property, and imposed the 'reasonably

necessary' requirement as a limitation on that right." *Id.* The court concluded that

nothing in either case suggested that the 'reasonably necessity' requirement could be

"grafted into a *statutory* defense." *Id.* Secondly, the court in *Wilson* reasoned that the

plain language of RCW 16.08.020 does not contain a "reasonable necessity" requirement.

Thus, the court held that "reasonable necessity" is not a requirement of RCW 16.08.020.

We follow Division Two and, for the same reasons, hold that "reasonable

necessity" is not an element of RCW 16.08.020. Alternatively, the Gomsruds argue that

RCW 16.08.020 is in derogation of the common law and must be strictly construed. We

disagree that RCW 16.08.020 is in derogation of the common law.

As discussed above, the seminal cases all discuss the "reasonable necessity"

requirement as it applies to the constitutional right to shoot animals to protect property.

*Burk*, 114 Wash. at 376 (holding that "the appellant in this case had a constitutional right

to show, if he could, that it was reasonably necessary for him to kill these elk for the

protection of his property"); *Drolet*, 141 Wash. at 655-56 ("[A] person has a natural right

to defend and protect his domestic fowls, and in doing so may kill dogs engaged in

injuring and destroying them if there is reasonable and apparent necessity therefor."

(Emphasis added.)); *State v. Vander Houwen*, 163 Wn.2d 25, 177 P.3d 93 (2008)

(discussing the constitutional right to defend property under Washington's Constitution

article I, section 3). Indeed, the court in *Wilson* noted that "*Burk*, *Drolet*, and *Vander

Houwen* do not address RCW 16.08.020 or its predecessor statutes." 10 Wn. App. 2d at

728. Thus, the Gomsruds' argument that RCW 16.08.020 is in derogation of the common

law is unpersuasive.

### B. MEANING OF "CHASING" AS USED IN RCW 16.08.020

The Gomsruds argue that the word "chasing" as used in RCW 16.08.020

contemplates "free and unrestricted pursuit." Appellants' Br. at 35. Thus, the Gomsruds

contend that the fence of Mr. Campeau's chicken enclosure prevented the dog he espied

from "chasing" the chickens within the meaning of the statute.

The term "chasing" is not defined within the chapter. The first step in discerning

the meaning of the term "chasing" is to look to the ordinary definition of the term.

*Lockett v. Saturno*, 21 Wn. App. 2d 216, 223, 505 P.3d 157 (2022). If the statute's

meaning is plain on its face then the court gives effect to that plain meaning. *Dep't of

Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). A dictionary

may be used to ascertain the ordinary meaning of the undefined term. *Seattle Hous. Auth.

v. City of Seattle*, 3 Wn. App. 2d 532, 538, 416 P.3d 1280 (2018). "Unlikely, absurd or

strained results are to be avoided." *Morris v. Blaker*, 118 Wn.2d 133, 143, 821 P.2d 482 (1992).

The dictionary definition of the verb "chase" is "the act of pursuing for the purpose of seizing, capturing, molesting, doing violence, or killing." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 379 (1993). This definition does not require that the "chase" be free and unrestricted, as the Gomsruds suggest.

Even with a fence between the dog and Mr. Campeau's chickens, a dog running up and down a fence line attempting to snatch chickens from the enclosure fits squarely within our definition of "chase." A fence or other barrier does not negate a pursuer's purpose of attempting to seize, capture, molest, do violence, or kill. The dog Mr. Campeau witnessed harassing his chickens was "chasing" them within the meaning of RCW 16.08.020.

### C. MEANING OF "INJURING" AS USED IN RCW 16.08.020

The Gomsruds argue that the dog Mr. Campeau saw harassing his chickens was not "injuring" them within the meaning of the statute. We agree that the dog was not "injuring" Mr. Campeau's chickens within the meaning of RCW 16.08.020.

Mr. Campeau alleges that the injury to his chickens was not, initially, physical but that his chickens were "stress[ed]" by the encounter with the dog. Resp'ts' Corrected Resp. Br. at 17. He alleges that this produced "latent physical manifestations of injury."

14

*Id.* Mr. Campeau points to the fact that his chickens did not produce eggs for several days after the incident and that one of them was found dead the next day. We disagree that the mental stress to Mr. Campeau's chickens, even if it later became apparent in the chickens' physical condition, qualifies as an "injury" within the meaning of RCW 16.08.020.

Our "fundamental objective in interpreting statutes 'is to ascertain and carry out the Legislature's intent.'" *Silver v. Rudeen Mgmt. Co.*, 197 Wn.2d 535, 542, 484 P.3d 1251 (2021) (quoting *Dep't of Ecology v. Campbell & Gwinn, LLC.*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002)). "[I]f the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent." *Campbell & Gwinn*, 146 Wn.2d at 9-10.

The dictionary defines "injure" as "to inflict bodily hurt on." WEBSTER'S, *supra*, at 1164 (1993). The definition of "injure" does not contemplate harm to a chicken's mental health or death due to mental distress.

Further, RCW 16.08.020 uses the terms "biting" and "killing" as alternative justifications for slaying a dog seen doing harm to a person's livestock or poultry. The use of these terms supports our interpretation of the term "injuring" as requiring "bodily hurt." It is undisputed that the dog seen by Mr. Campeau harassing his chickens did not, in the present sense, inflict any bodily hurt on them. Mr. Campeau conceded at his

15

deposition that there was no "physical injury" to his chickens. CP at 39. At most, Mr. Campeau was injured by the dog's harassment of his chickens because he did not receive eggs for several days. However, RCW 16.08.020 discusses "injuring" livestock, not to the livestock owner.

Additionally, the statute uses the present tense when describing the justifications for killing a dog ("chasing, biting, injuring or killing"). The injuries Mr. Campeau claims his chickens experienced did not present themselves until after the dog chased them. Thus, Mr. Campeau's chickens were not "injured" within the meaning of the RCW 16.08.020.

### D. WHETHER MR. CAMPEAU WAS QUALIFIED TO GIVE AN EXPERT OPINION ON THE CAUSATION OF HIS CHICKENS' DEATH AND "INJURIES"

The Gomsruds argue that Mr. Campeau was not qualified to offer expert testimony as to the causation of his chickens' death or injury. Because we determined Mr. Campeau's chickens were not injured within the meaning of RCW 16.08.020, it is immaterial whether Mr. Campeau is qualified to opine as to the cause of his chickens' death or injuries. Thus, we decline to address the issue.

### E. WHETHER MR. CAMPEAU HAD "CONTROL" OF MS. HIPNER'S PROPERTY WITHIN THE MEANING OF RCW 16.08.020

Both the Gomsruds and the Campeaus agree that Mr. Campeau had to "own," "lease," or "control" the property on which he saw his livestock being harassed and the

property on which he killed Rainier to allow the defense under RCW 16.08.020.

Appellants' Br. at 39; Resp'ts' Corrected Resp. Br. at 27-28. The Gomsruds argue that

Mr. Campeau did not have control of the property on which Rainier was shot within the

meaning of RCW 16.08.020. Mr. Campeau argues that the General Affidavit between he

and Ms. Hipner shows that he had control of the property. Whether or not Mr. Campeau

had control of Ms. Hipner's property when Rainier was shot is a question of fact that we

leave to the jury.

The General Affidavit between Ms. Hipner and Mr. Campeau states, in relevant

part:

> I Kimberly I Hipner have given Daniel R. Campeau permission to help me
> care take [sic] my land/buildings and all that this entails, Security of
> premise ingress and regress of all property boundaries against predators,
> illegal activities, harm to livestock. Location of this premise is as follows:
> 1550 Old Cowiche rd. Tieton Washington, 98947. This agreement to
> commence on June 16, 2018. This agreement between the above listed
> parties will remain in affect [sic] until such time as both parties agree to
> dissolve the above agreement.

CP at 61.

The Gomsruds note that Ms. Hipner testified at her deposition that Mr. Campeau

was not her agent and she would not indemnify him for his actions on her property:

> Q. Did you believe [Mr. Campeau] to be your agent for these express
>    purposes?
>
> A. I think he was just—he was just looking out for my best interests. *I
>    wouldn't necessarily say he was an agent.* I would say he was being a
>    good neighbor. You know, I didn't hire him as security. It wasn't—it

was just something he wanted in writing and I was fine with it, you know.

. . . .

Q. BY MR. KARP: Go ahead. Like your insurance or personally. Do you believe that you are responsible to pay for any harm that Mr. Campeau inflicted on your property?

A. Oh, absolutely not. No. It was just the good neighbor thing. So if he had someone at gunpoint that was breaking into my house and the police showed up, then he would say, you know, "No, wait. Kim knows me. Let me get my paper," blah, blah, blah, you know, but—yeah, *he wasn't my agent.*

Q. Okay.

A. I didn't hire him to do things. *It was still he's responsible for his choices. I'm responsible for mine.* It's just because I have friends in law enforcement and they see my name and they know me, but they don't know him, and they don't know if I would vouch for him or if he, you know, has my permission to be on my property kind of thing.

I mean, if she [sic] showed up and he was kicking a door in on my property, that would not be appropriate, and I would not—*I mean, that paper doesn't say he can do whatever he wants on my property*, even if it's illegal.

CP at 217 (emphasis added).

Here, a jury could find that Mr. Campeau was in "control" of Ms. Hipner's property within the meaning of RCW 16.08.020 based on their agreement. Alternatively, the Gomsruds provided deposition testimony from Ms. Hipner suggesting that Mr. Campeau may *not* have had the requisite control of her property at the time he shot Rainier. Given the competing evidence, there is an issue of material fact related to

18

whether or not Mr. Campeau had "control" of Ms. Hipner's property within the meaning of the statute.

### II. WHETHER THE GOMSRUDS' RECKLESS INFLICTION OF EMOTIONAL DISTRESS CLAIM WAS IMPROPERLY DISMISSED

The Gomsruds posit that Mr. Campeau "killed Rainier with reckless indifference to the foreseeable emotional distress that would befall her family." Appellants' Br. at 41. The Gomsruds also argue that Rainier was an "immediate family member" of Mr. Gomsrud and that he should therefore be able to recover for reckless infliction of emotional distress under a bystander theory. *Id.* at 47. The Gomsruds concede that the current state of the law is that a dog is not an "immediate family member" but they urge us to hold otherwise. We decline the Gomsruds' invitation to designate a dog an "immediate family member" for purposes of reckless infliction of emotional distress.

Reckless infliction of emotional distress, also known as "the tort of outrage" requires proof of three elements: "(1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) actual result to plaintiff of severe emotional distress." *Kloepfel v. Bokor*, 149 Wn.2d 192, 195, 66 P.3d 630 (2003). A claim for reckless infliction of emotional distress requires behavior "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* at 196 (quoting *Grimsby v. Samson*, 85 Wn.2d 52, 59, 530 P.2d 291 (1975)).

"Bystander negligent infliction of emotional distress claims involve emotional trauma resulting from one person's observation or discovery of another's negligently inflicted physical injury." *Hegel v. McMahon*, 136 Wn.2d 122, 125-26, 960 P.2d 424 (1998). In order to recover for a claim of reckless infliction of emotional distress under a bystander theory, "the plaintiff must be an immediate family member of the person who is the object of the defendant's actions, and he must be present at the time of such conduct." *Grimsby*, 85 Wn.2d at 60.

The class of "immediate family members" who can recover for reckless infliction of emotional distress is limited to those who are permitted to bring a wrongful death action pursuant to RCW 4.20.020 (spouses, domestic partners, children, stepchildren, parents, and siblings). 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 14.03, cmt. at 185 (2019); *See Strickland v. Deaconess Hosp.*, 47 Wn. App. 262, 268-69, 735 P.2d 74 (1987) ("Therefore, we determine the class of 'immediate family members' entitled to recover under a theory of outrage consists of those who are permitted to bring wrongful death actions.").

The Gomsruds' first theory of liability for their reckless infliction of emotional distress claim is that Mr. Campeau's conduct was directed at the Gomsruds themselves because Mr. Campeau knew, or should have known, that his actions would cause the Gomsruds severe emotional distress. Alternatively, they argue that Mr. Gomsrud can

recover under a bystander theory because Rainier was an "immediate family member" of the Gomsruds. We disagree with the Gomsruds and conclude that their claim for reckless infliction of emotional distress was properly dismissed on summary judgment.

Here, Mr. Campeau's actions were undeniably directed at Rainier, not the Gomsruds. In a declaration filed with his reply brief on his first motion for summary judgment, Mr. Campeau stated, "I never saw Ms. Long or Mr. Gomsrud until they came onto Ms. Hipner's property to confront us." CP at 296. He further declared that he "believed Rainier was a stray with no owner because there were no visible tags and Rainier appeared as if she had been rolling around in dirt." *Id*. This statement was consistent with Mr. Campeau's deposition testimony in which he stated, "I had no idea the dog belonged to anybody. It was filthy dirty and it had no identification that could be discerned even through a 40-power scope on full magnification." CP at 54. Mr. Campeau's actions could not have been directed at the Gomsruds if he did not even see them when he shot Rainier and if he thought Rainier was a stray.

As to the Gomsruds' bystander theory, the state of the law is that a dog is undisputedly not an "immediate family member" and we decline the Gomsruds' provocation to create such an extension.

The Gomsruds' point to comment *c.* in the *Restatement* (*Second*) *of Torts* § 46 (AM. L. INST. 1965), titled "*Outrageous Conduct Causing Severe Emotional Distress*:"

21

> The law is still in a stage of development, and the ultimate limits of this tort are not yet determined. This Section states the extent of the liability thus far accepted generally by the courts. The Caveat is intended to leave fully open the possibility of further development of the law, and the recognition of other situations in which liability may be imposed.

The Gomsruds argue that this comment demonstrates the evolving nature of the common law doctrine of reckless infliction of emotional distress. While the nature of the doctrine may be ever changing, we decline to take the drastic leap of qualifying a dog as an immediate family member.

> The Gomsurds also point to illustration 11 contained in the *Restatement* § 46:

> A, who knows that B is pregnant, intentionally shoots before the eyes of B a pet dog, to which A knows that B is greatly attached. B suffers severe emotional distress, which results in a miscarriage. A is subject to liability to B for the distress and for the miscarriage**.**

This illustration does not support the Gomsruds' position. In this illustration, B's conduct was directed at A. B shot the dog, knowing A was greatly attached to it, while A was present. Here, Mr. Campeau's conduct was *not* directed at Mr. Gomsrud or the Gomsruds in general. In fact, he thought Rainier was a stray. Further, B's conduct resulted in bodily hurt to A, who miscarried. If an individual's outrageous conduct directed at a third person (or dog, as the Gomsruds urge us to treat as akin to a human) results in actual bodily hurt to the bystander, the third person need not be an immediate family member. RESTATEMENT § 46.

Finally, the Gomsruds argue that we should consider Judge George Fearing's sagacious concurrence in *Repin v. State* in which he advocated for a change in the law to allow recovery for the loss of "a human-animal" bond via a negligent infliction of emotional distress claim. 198 Wn. App. 243, 286, 392 P.3d 1174 (2017). However, "[w]e are bound to follow Supreme Court precedent." *Peterson v. Dep't of Lab. & Indus.*, 17 Wn. App. 2d 208, 222, 485 P.3d 338 (2021). As the law stands, dogs are not immediate family members.

III. WHETHER THE GOMSRUDS' CLAIM FOR MALICIOUS INJURY TO A PET WAS IMPROPERLY DISMISSED

The Gomsruds argue that their malicious injury to pet claim was improperly dismissed. We disagree because the Gomsruds failed to establish malice.

In *Womack v. Von Rardon*, 133 Wn. App. 254, 263, 135 P.3d 542 (2006), we recognized malicious injury to a pet as a cause of action for which emotional distress damages could be recovered. The elements of malicious injury to a pet are: (1) injury to a pet, and (2) malice. *See id*. Title 16 RCW titled "Animals and Livestock" states "'Malice' has the same meaning as provided in RCW 9A.04.110." RCW 16.52.011(k). RCW 9A.04.110(12) states:

> 'Malice' and 'maliciously' shall import an evil intent, wish, or design to vex, annoy, or injure another person. Malice may be inferred from an act done in willful disregard of the rights of another, or an act wrongfully done without just cause or excuse, or an act or omission of duty betraying a willful disregard of social duty.

23

The Gomsruds failed to show malice. Mr. Campeau shot Rainier because he thought she had been harassing his chickens and that she was a further threat to them if not neutralized. Even if Rainier was not the dog that Mr. Campeau saw near his chicken coop, Mr. Campeau's mistake in shooting her does not prove malice. The Gomsruds argue that Mr. Campeau was "enraged and physically shaking with anger" after he killed Rainier and that this proves malice. CP at 161. However, Mr. Campeau's emotions following his actions do not prove he acted with an "evil intent."

The Gomsruds' malicious injury to pet claim was properly dismissed.

IV. WHETHER THE GOMSRUDS' CLAIM FOR CONVERSION WAS IMPROPERLY DISMISSED

The Gomsruds argue that their conversion claim was improperly dismissed. They argue that we should adopt the view that destruction of another's property is a way in which a conversion can occur. We disagree.

"Conversion is the act of willfully interfering with any chattel, without lawful justification, whereby any person entitled thereto is deprived of the possession of it." *Repin*, 198 Wn. App. at 270. There are three elements to conversion: "(1) willful interference with chattel belonging to the plaintiff, (2) by either taking or unlawful retention, and (3) thereby depriving the owner of possession." *Burton v. City of Spokane*, 16 Wn. App. 2d 769, 773, 482 P.3d 968 (2021) (citing *Judkins v. Sadler-Mac Neil*, 61 Wn.2d 1, 3, 376 P.2d 837 (1962)). An essential element of conversion is the taking of

24

possession of the chattel. *Repin*, 198 Wn. App. at 270. "There must be some assertion of right or title hostile to the true owner." *Id.* at 271.

Though it is a very old case, *Spokane Grain Co. v. Great Northern Express Co.*, 55 Wash. 545, 104 P. 794 (1909), is instructive. There, a grain company hired the defendant railway to transport horses between Seattle and St. Paul. During the trip, a fire broke out injuring two horses, one of which later died. The railway company removed the two injured horses from the train car in Spokane so that they could receive care. The grain company sued the railway company for conversion of the two horses and the jury awarded it $360. On appeal, the railway company argued there was no evidence to support a claim for conversion and the Supreme Court agreed. The Supreme Court held that the railway never sought title to the horses or to permanently deprive the grain company of possession of the horses and thus a claim for conversion could not be supported.

Similarly, here, it is undisputed that Mr. Campeau never sought title to or possession of Rainier. Because the Gomsruds fail to demonstrate that Mr. Campeau sought to take title or possession of Rainier, their claim for conversion fails.

The Gomsruds urge us to adopt the view that destruction of a chattel also constitutes a conversion. *Restatement* § 226, titled "*Conversion by Destruction or Alteration*," states:

25

> One who intentionally destroys a chattel or so materially alters its physical condition as to change its identity or character is subject to liability for conversion to another who is in possession of the chattel or entitled to its immediate possession.

However, Washington has not adopted this means of conversion, and no Washington case has held that a conversion occurs by destruction even when the defendant does not take title to the plaintiff's property.

The Gomsruds' conversion claim was properly dismissed.

### V. WHETHER THE GOMSRUDS MAY RECOVER FOR EMOTIONAL DISTRESS DAMAGES FLOWING FROM THEIR CONVERSION AND TRESPASS TO CHATTEL CLAIMS

The Gomsruds argue that they should be allowed to recover emotional distress damages flowing from their conversion and trespass to chattel claims. We agree, in part. The Gomsruds' conversion claim was properly dismissed by the trial court, however, their trespass to chattel claim survives and they may seek emotional distress damages for that claim.

Recently, we decided *Thorley v. Nowlin* in which we allowed emotional distress damages for conversion. ___ Wn.2d ___, 542 P.3d 137, 151 (2024). We recognized that, "A hundred-year succession of Washington cases supports damages for emotional distress arising from intentional torts." *Id.* at 145. Trespass to chattel is an intentional tort. *See Birchler v. Castello Land Co.*, 133 Wn.2d 106, 115, 942 P.2d 968 (1997).

26

No. 39676-2-III
*Gomsrud v. Campeau*

Thus, the Gomsruds may recover emotional distress damages if their claim for trespass to chattel is successful.

We remand for further proceedings consistent with this opinion.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Cooney, J.

I CONCUR:

_____
Staab, A.C.J.

No. 39676-2-III

FEARING, J. (concurrence) — I disagree with one ruling of the majority. I conclude that the meaning of "injuring," as found in RCW 16.08.020, extends beyond physical injury. The statute should include emotional distress and other psychic injury to an animal, including a chicken.

RCW 16.08.020 declares:

> It shall be lawful for any person who shall see any dog or dogs chasing, biting, *injuring* or killing any . . . domestic animal, including *poultry*, belonging to such person, on any real property owned or leased by, or under the control of, such person . . . to kill such dog or dogs.

(Emphasis added.) The majority employs *Webster's Third New International Dictionary* to confine the meaning of "injuring." The majority actually quotes the definition of "injure" rather than "injuring," but I do not quarrel with failure to use the gerund. I bicker with the majority's limiting the use of the dictionary definition to the first of many definitions presented by the *Webster's Third New International Dictionary* for "injure."

The full definition of "injure" found in the *Merriam-Webster Online Dictionary* reads:

> **1 a :** to inflict bodily hurt on
>    **b :** to impair the soundness of
>      *injured* her health
>    **c :** to inflict material damage or loss on
>
> **2 a :** to harm, impair, or tarnish the standing of

> *injured* his reputation
> **b :** to give pain to
> *injure* a person's pride
> **c :** to do an injustice to **: WRONG**

https://www.merriam-webster.com/dictionary/injure (last visited May 23, 2024).

The impairment of the soundness of the animal and the infliction of pain on the animal extends to stress and discomfort caused by harassment.

I recognize that a court should not always harness all of a word's dictionary definitions when construing a statute. *State v. Lilyblad*, 163 Wn.2d 1, 9, 177 P.3d 686 (2008); *State v. Valdiglesias LaValle*, 23 Wn. App. 2d 934, 945, 518 P.3d 658 (2022), *rev'd on other grounds*, 2 Wn.3d 310, 535 P.3d 856 (2023). But, the majority and the Gomsruds do not argue for a limitation on the definitions relevant to our construction of RCW 16.08.020. The testimony of Daniel Campeau shows that chickens can suffer as much from psychic injury as with physical injury. The language of RCW 16.08.020 suggests no limits to the forms of injury qualifying for the application of the statute.

I otherwise agree with the analysis of the majority opinion and concur in the result.

I concur:

_____
Fearing, J.